THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JANET JEAN JACKSON, Defendant-Appellant.

Third District   No. 3—87—0638

Opinion filed March 7, 1989.

80

Daniel D. Yuhas and Gloria A. Carroll, both of State Appellate Defender's Office, of Springfield, for appellant.

David Zwicker, State's Attorney, of Aledo (Terry A. Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Janet Jean Jackson was convicted of murder, conspiracy, solicitation, and armed robbery for her participation in the events which resulted in the death of her estranged husband, Kim Jackson. She was sentenced to natural life imprisonment for murder and received a term of 30 years' imprisonment for armed robbery. The defendant appeals, seeking reversal and retrial or, alternatively, a remand for a new sentencing hearing. We affirm.

Kim Jackson was beaten to death in his unoccupied farmhouse in the early morning hours of November 23, 1986. The defendant, Janet Jackson, originally claimed that she and her estranged husband were attacked by an unknown assailant when they entered the dark house, but the investigation soon focused on the defendant and her two companions, Michael Miller and Tony Royark. The defendant, Miller, and Royark gave detailed statements to the police and admitted participating in Kim's murder. On January 7, 1987, the State charged all three with armed robbery, murder and conspiracy; the defendant herein was also charged with solicitation on grounds that she encouraged or requested Miller and Royark to murder the victim.

The record in this case is extensive and spanned over 2,000 pages. Accordingly, the summation of the relevant proceedings and evidence is, of necessity, somewhat lengthy.

On February 4, 1987, the defendant filed a motion to suppress all confessions and statements she made to the police on grounds that they were not made voluntarily and they were obtained in violation of her right to counsel and her right to remain silent. After a hearing on the motion, the trial court found that the defendant had been given *Miranda* warnings, that her statements were made voluntarily, and

that she had not requested counsel. The motion to suppress was, therefore, denied. On May 6, 1987, the defendant renewed her motion to suppress and alleged additional reasons for finding that her statements were involuntary and should be suppressed. This motion was also denied.

On May 14, 1987, the State filed a motion *in limine* requesting the court to exclude all testimony of Noble Harrison, a psychologist, regarding his examination of the defendant and precluding references to any opinion formed by him as a result of the examination. The State argued that the testimony would be irrelevant to the defendant's guilt or any issue at trial. The defendant argued that she intended to show that Dr. Harrison's report indicated she suffered from the battered woman syndrome and to use his testimony to explain the emotional characteristics of battered women to the jury. The State's motion was granted.

During the course of the trial, the issue of whether evidence of the battered woman syndrome would be admissible was again raised. After hearing the arguments of counsel, the court reiterated that Dr. Harrison's testimony would be precluded. The defendant inquired whether she should make an offer of proof, and the court stated it would listen to one. During a later discussion of the matter, the court stated it would not preclude the defendant from making an offer of proof, but indicated the offer would not, in all likelihood, alter its decision. The defendant elected not to make an offer of proof.

Additionally, the State made a motion *in limine* seeking an order precluding testimony about the victim's abuse of the defendant prior to December of 1985. The court granted the motion, agreeing with the State that the precluded evidence would not be relevant.

Michael Miller, who was 15 years old when Kim was murdered, pleaded guilty to conspiracy (murder) (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a)) and attempt (murder) (Ill. Rev. Stat. 1985, ch. 38, par. 8—4) and agreed to testify for the State. Tony Royark pleaded guilty to armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), and conspiracy (murder) (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a)).

Michael Miller testified about his relationship with Royark and the defendant and about the events leading up to the murder. Miller began living in the Jacksons' home in December of 1985. The victim and the defendant were living together as husband and wife at this time. Miller admitted that he and the defendant began having a sexual relationship approximately three months after he moved in. He also admitted that he had an ongoing sexual relationship with Royark.

Miller testified that he, the defendant, Royark, and Fay Jackson, the victim's brother, frequently discussed murdering the victim, and they began planning his murder in May of 1986. At that time, the defendant informed them that Kim had insurance policies. According to Miller, the defendant stated that she, Royark, and Miller could use the victim's insurance money to purchase a house to rent out. He testified that Royark contacted a realtor and they viewed a house, but did not purchase it.

In August of 1986, the victim moved out of the marital residence at the defendant's insistence. Miller stated that the first murder attempt took place on August 28, 1986, after the victim moved out. On that date, Royark loosened a gas pipe beneath the trailer in which the victim was living, in an attempt to blow up the trailer. Miller testified that after Royark was arrested for that attempt, the defendant stated that they would have to try something else because Kim was a witness. According to Miller, they had discussions about killing him with an overdose of drugs, and during September or October of 1986, the defendant gave the victim Valium in vitamin capsules.

Miller testified that in September of 1986, Todd Brown, a clerk at a convenience store, told them that his wife had a boyfriend and that a friend of his was "going to take care of it" for him. Miller stated that the defendant made repeated inquiries about the friend because she wanted him to kill her husband. According to Miller, Brown told the defendant it might cost her $3,000 to $4,000, but the defendant said that money was no object.

Miller stated that the victim secured a job with the Rock Island Post Office in September and the defendant helped him fill out his insurance papers. The defendant told Miller that she convinced the victim to increase the amount of the policy to $100,000 and to list her and the couple's daughter as beneficiaries.

Miller also testified about the final events leading up to the murder. He stated that on Saturday, November 22, he, Fay Jackson, Royark, and the defendant were at the defendant's home, and the defendant stated she had "had it" and that was the day Kim would have to die. She stated she would get the victim to their farm, and Royark stated he and Fay would take care of him. Miller told the jury that Royark suggested beating the victim to death, and that Royark and the defendant wanted to make it look like a robbery. According to Miller, the defendant spoke with the victim by telephone and set up a date with him for later that evening. The defendant also told the victim she wanted him to move home after their date, but that she wanted to go to their farm before they moved his belongings home.

Miller stated that the defendant told them that the victim would receive his paycheck that day and might be carrying approximately $800. Royark then stated that he would keep that money as part of his share. Miller testified that he and Royark later went to Royark's house, and he went to sleep there.

Miller told the jury that at 2 a.m. on November 23, Royark awakened him and told him he would have to come along. Miller knew that Royark intended to go to the Jacksons' farm to kill Kim Jackson. Miller stated that before he left, he picked up two pieces of pipe as Royark directed. They drove a borrowed car to the farm.

Miller continued his testimony, stating that he parked the car in the side yard, out of sight. Royark broke into the farmhouse and they entered. Miller stated that they walked into the kitchen and Royark gave him the heavier pipe, which was a gas pipe approximately one foot long, while Royark kept the lighter pipe, a water pipe which was approximately 3½ feet long. Royark told Miller to give him the heavier pipe and turn on the kitchen light when Royark yelled for him.

Miller testified that the Jacksons arrived approximately 10 minutes after he and Royark entered the house. Royark moved to a doorway near the front door and crouched down, Miller said. Miller indicated that he heard the front door open, a few footsteps, and a voice he identified as the victim's. According to Miller, the victim moved closer to Royark's location and the defendant then asked him to turn around and give her a kiss. When the victim turned, Royark hit him twice above the shoulders. Miller stated that when Royark yelled for the heavier pipe, the defendant turned on the light and took the pipe to Royark, who hit the victim with it, causing him to fall to the floor. When Royark finished beating the victim, and he and the defendant were convinced the victim was dead, Miller and Royark prepared to leave. According to Miller, the defendant reminded Royark to take the victim's wallet, which Royark did. The defendant stated she would stay in the house for 2½ hours, and then go to the neighbor's house. Royark took the defendant's purse, Miller said, and the defendant then told Royark to hit her. Royark hit the defendant in the mouth with his fist, and hit her on the head and torso with a board.

Royark and Miller left the farm in the car, and Miller said Royark threw the wallet and purse out on a rural road, after removing $100 from the wallet. They left the car at the defendant's house and returned to Royark's residence.

Miller testified that he was arrested on Tuesday, November 25, and admitted that before he was arrested, he and Royark disposed of

the defendant's credit cards, his shoes, the gloves they wore at the farm, and the floor mats from Royark's truck. Miller said that Royark used some of the money he took from the victim. After he was arrested, Miller helped the police recover some of the evidence.

On cross-examination, Miller admitted that the statement he initially gave to the police was false. He said he lied to the police because he was frightened.

Duane and Michelle Jenkins, who live near the Jacksons' farm, testified that the defendant pounded on their door at approximately 5 a.m. on November 23, 1986. Each witness stated that the defendant was hysterical and reported that her husband had been hurt at the farm.

Other witnesses for the State corroborated much of Miller's testimony. Michael Ogryzek, a crime scene technician for the Illinois State Police, testified that a three-fourth inch gas pipe, a one-half inch galvanized water pipe, and a section of two-by-four lumber were recovered at the scene. Based on his observations of the victim and the blood spatters surrounding him, the witness concluded that the victim was struck both while standing and while lying down. Further, Ogryzek testified that the victim's life insurance form, showing he elected coverage five times the amount of his salary, was retrieved from the side of the rural highway, along with other papers and identification belonging to the Jacksons.

Todd Brown, the convenience store clerk, testified that a few weeks after he told the defendant that his wife had a boyfriend and he knew of a man who could take care of the boyfriend, the defendant asked Brown if he could find someone to kill her husband. Brown told her he could not, but the defendant raised the issue again approximately 10 times when she came into the store over the next three to four weeks. Brown testified that he originally did not take the defendant's requests seriously, but during their final discussion of the matter, he thought she was serious about finding a killer.

Pam Kinner, in whose trailer the victim resided after the defendant directed him to move out of the marital residence, testified that on two occasions in August of 1986, the gas pipes under her trailer were tampered with. The witness also testified that on November 22, 1986, she heard the victim speak to the defendant by telephone, and during the course of the conversation, she heard the victim ask repeatedly what his surprise was. When he finished the telephone conversation, the victim told Kinner to pack his bags because it appeared he was going home.

Barbara Wlaskolich, the personnel assistant at the Rock Island

Post Office, testified that she explained to the victim that the basic life insurance provided by the postal service was the equivalent of one year's salary, or $20,000, but that he could purchase coverage up to five times his salary. The witness stated that Kim elected the basic $20,000 policy at that time, but wished to discuss it with his wife. Wlaskolich testified that later Kim completed a life insurance form electing optional insurance coverage at five times his pay, or $100,000. His child and the defendant were listed as beneficiaries.

Perry Munson, a real estate broker, testified that on August 19, 1986, he showed a house which was for sale to Royark. He stated that approximately two weeks later, Royark viewed the home again, this time with Miller and the defendant. Royark signed a written offer, but Munson said he discarded it because no earnest money was put down.

Over the defendant's objection the State introduced two oral statements she made to the police. Marvin Thirtyacre, the sheriff of Mercer County, testified that he was in the interrogation room at State Police headquarters for a portion of the time when the defendant was questioned on November 25, 1986. The sheriff said that after the defendant gave her statement, while standing in a hallway awaiting transportation to jail, she approached him and said, "You forgot to ask me one thing." When Sheriff Thirtyacre inquired what he should have asked, the defendant said, "You forgot to ask me if I would do it again." The sheriff told the jury that he asked her if she would do it again, and the defendant answered, "Yes." Next, the State presented the testimony of Mark Scritchfield, the officer who subsequently booked the defendant at the Rock Island sheriff's department. The officer testified that while he was fingerprinting the defendant, she asked him what it felt like to print a murderer. He responded by asking the defendant if she had murdered someone, to which she replied, "Yes, I did."

Lucile Hauerwas, the defendant's aunt, testified for the defense. She stated that she and the Jacksons resided in the same house for approximately five years before the murder. The defendant attempted to elicit testimony of the victim's treatment of her during the early part of that five-year period, but the State's objection on grounds of relevancy was sustained. The witness was permitted to testify about an instance in September of 1986 when the victim physically and verbally abused the defendant.

Janet Jackson testified in her own defense. First, she explained the oral statements made to Sheriff Thirtyacre and Officer Scritchfield, which were introduced in the State's case. The defendant

stated that when she told the sheriff that he forgot to ask her one question, she believed she was under arrest for lying to the police because she gave a fictitious description of the attacker. Therefore, the defendant told the jury, when she told the sheriff that she would do "it" again, she meant that she would lie to the police and provide a false description because she was afraid of Royark, Miller, and the police. The defendant stated that when she asked the booking officer what it felt like to print a murderer, she was referring to Royark and Miller because she saw a sheet which indicated they had been charged with murder. The defendant testified that when the booking officer responded to her question by asking if she had murdered someone, she said, "I guess I did," because the card with her fingerprints said "murderer."

The defendant admitted she looked at a house, as the real estate broker testified, but stated that she did so because she likes to look at houses and because Royark told her it had nice woodwork.

According to the defendant, the convenience store clerk told her she should get a hit man and volunteered to locate one. She did not think the clerk was serious initially. However, the defendant testified, approximately a week and a half before the victim was murdered, the clerk told her he would kill the victim for a couple of thousand dollars because he needed the money. The defendant stated she had no further conversations with the clerk because she did not like what he had said.

The defendant acknowledged that on Friday, November 21, she obtained Valium for her husband from Royark, but said she did so because her husband had complained he was not sleeping well, and not because she intended to kill him. The defendant denied having any conversation with Miller about the Valium.

The defendant testified that after her husband began working at the Rock Island Post Office, he told her that he had taken out a $100,000 insurance policy, but she stated he did not request her assistance in filling out the insurance forms or tell her who the beneficiaries were under the policy. The defendant told the jury she did not recall speaking to Miller about her husband's life insurance. She also stated that the letters found along the road near her purse, one of which related to the victim's newly acquired insurance, were not in her purse when the victim was killed.

The defendant testified that her husband was a large man who sometimes shook her, pushed her, and subjected her to mental abuse. She stated that she felt helpless and that her husband dominated her completely. She provided further details of the instance of the victim's

abuse described by her aunt in her earlier testimony.

The defendant testified about the events leading up to the murder. She stated that she, Miller, and Fay Jackson spent the morning of Saturday, November 22, at Royark's home. She made plans for a date with her husband that evening and also heard discussions regarding his murder. Several methods were discussed, the defendant said, including one in which Fay, Royark, and Miller would hide at the farmhouse and beat or shoot the victim. None of the scenarios involved the defendant, and she testified that she did not encourage the discussions, ask anyone to kill her husband, agree to help anyone kill him, or intend that he be killed. The defendant further stated that she did not believe that the discussions were of a serious nature because they were similar to a game called "murder and mayhem." That game, according to the defendant, was played daily by her, Royark, Miller and his brother, and Fay Jackson, and involved formulating plots to murder Kim Jackson and "Elmer," a name the group used when the defendant became upset about the use of her husband's name.

The defendant testified that she went on the scheduled date with her husband that evening. She stated that at approximately 3:30 a.m., she told her husband she wanted to go home, but he drove them to their farmhouse instead. The defendant said they entered the dark house and she told the victim the location of the nearest light switch. She moved into another room and heard the victim say, "They are hitting me." She switched on the lights and turned toward the room he was in, she said, but Royark and Miller blocked her path. Royark pushed her away and gave Miller a short pipe. Miller left the room and Royark hit her several times with a board. When Miller returned, he hit her with his fist, she said. Royark then hit her on the head with the board and she either passed out or the lights in the house were turned off because everything went black. She discovered her husband's body but could not rouse him, and then crossed a field to get to the Jenkins' house. The defendant admitted that she gave an inaccurate description of the assailants to the police artist, but testified that she did so because she did not trust the police, Royark, or Miller.

On cross-examination, the State impeached the defendant with portions of the statement she made on the night she was arrested. In her statement to the police, the defendant admitted that she, Royark, Miller, and sometimes Fay Jackson had talked about her husband's murder since the summer of 1986, and that she knew Royark and Miller would be waiting for her husband at the farm. In her statement, the defendant also admitted that on the night of the murder,

Royark told her he intended to beat the victim up for his wallet and would also take the defendant's purse, to make it look like a robbery.

Following closing arguments and deliberations, the jury returned guilty verdicts on the counts of solicitation, conspiracy, murder, and armed robbery. Pursuant to a stipulation signed by Janet Jackson, Tony Royark, their attorneys, and an attorney for the State, a joint death-penalty sentencing hearing was held before the court. Under the terms of the stipulation, the court was to consider all of the evidence adduced at the defendant's trial to determine an appropriate penalty for her, and in a unitary hearing for Royark, was to consider the evidence from the trial and further cross-examination of Miller to determine Royark's eligibility for the death sentence and his penalty. The stipulation provided that all of the parties would be permitted to introduce new evidence regarding aggravating and mitigating factors.

The trial court initially found that the defendant was eligible for the death penalty because three aggravating factors were present: the murder was committed during the course of another felony, armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(a)(ii)); the defendant planned to procure the victim's insurance proceeds (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(5)); and the victim was murdered with the intent to prevent him from testifying against Royark in the arson case (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(8)).

Royark's hearing was then held. He testified about his relationship with the defendant and Miller and the events leading up to the murder. Royark's testimony covered various other topics, including previous plans to murder the victim and the group's intention to purchase a house so they could all live together. Counsel and the court specifically stated that Royark's testimony concerning the defendant would be considered only as to Royark.

The defendant's evidence in mitigation was subsequently presented. Dr. Noble Harrison testified that the defendant was experiencing some elements of the battered woman syndrome, in that she had difficulties forming close relationships with males, was dependent and needed male companionship, and sometimes had difficulty making sound judgments. He also found that the defendant had a tendency to be amoral and was immature emotionally. The psychologist stated that the defendant was influenced by the elements he mentioned, but at no time was she incapable of making sound decisions based on any relevant mental disorders.

The defendant testified about the emotional and physical abuse the victim inflicted on her during the early years of their marriage. The State questioned her about letters and love notes she had deliv-

ered to Royark during their incarceration. The State then argued for imposition of the death penalty.

The court found sufficient mitigating factors to preclude imposition of the death sentence but found the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty, pursuant to section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2)). After noting that it previously determined that statutory aggravating factors under section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) existed, the court sentenced the defendant to natural life imprisonment for murder and to 60 years' imprisonment for armed robbery. Following a hearing on the defendant's post-trial motion, the court reduced the 60-year term to a term of 30 years. The defendant filed a motion for a new trial, which was denied, and she now appeals.

■■ ■ The defendant first argues that the trial court erred when it failed to suppress the incriminating statements she made to the police, because the statements were obtained in violation of her invoked right to remain silent. At the hearing on the motion to suppress, Special Agent Stanley Talbot testified that the defendant agreed to accompany him to police headquarters, that he advised her of her constitutional rights, and she signed a written waiver. During questioning, the defendant indicated to Talbot that she did not wish to speak any further and she wanted to go home. Talbot stated that the defendant was told she was under arrest for murder and was not free to go. The police continued to question her for several hours, and the defendant finally made a taped confession.

The United States Supreme Court has held that a suspect's right to terminate questioning must be scrupulously honored and if the individual indicates at any time during questioning that he wishes to remain silent, the interrogation must cease. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) We agree with the defendant that when she told the police she wanted to stop talking and go home, she invoked her right to remain silent and questioning should have terminated. However, the taped confession the police obtained after their continued questioning of the defendant was introduced at trial only to impeach the defendant on cross-examination, and it is settled that statements obtained in violation of *Miranda* may be used to impeach a defendant on cross-examination. (*Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.) Therefore, even though the defendant's right to terminate questioning was not scrupulously honored, the subsequent confession was voluntarily made and was properly introduced to impeach the defendant during

cross-examination.

■■ The defendant also contends that the trial court should have suppressed the oral statements she made to the sheriff and the booking officer after she gave a taped confession to the police. These statements were admitted in the State's case in chief, and on appeal the defendant asserts that she would not have made them if the police had honored her request to remain silent and had not beaten her down mentally by hours of interrogation. The State contends that the oral statements were properly admitted because they were volunteered by the defendant and were not the product of police interrogation. *People v. Lang* (1982), 106 Ill. App. 3d 808.

While the defendant now argues that her inculpatory oral statements were products of lengthy police questioning which wore her down, our review of the record reveals that at trial, the defendant, too, treated the statements as voluntary and spontaneous, and offered innocent explanations for them. Specifically, the defendant told the jury that when she stated to the sheriff that she would do "it" again, she meant she would give the police false information, and when she asked the officer what it felt like to fingerprint a murderer, she was referring to Miller and Royark. This testimony amply supports the State's argument that the oral statements were volunteered and therefore were properly admitted in the State's case in chief.

■■ ■ Next, the defendant argues that the court erred when it precluded her expert from testifying about the battered woman syndrome and limited the testimony on the victim's abusive acts because it denied her the right to present her theory of defense. The defendant contends her expert's testimony would have shown that it was possible for her to believe the plans to kill her husband were a game and would have explained that she did not seek help from the police because she trusted no one and was paralyzed by her helplessness. The State contends that the defendant has waived consideration of this issue on appeal by failing to make an offer of proof at trial.

The question of the admissibility of this evidence was raised prior to trial in the State's motion *in limine*, and after hearing arguments, the trial court granted the motion. The defendant stated she would make an offer of proof at the appropriate time. The issue was again raised at trial, during the defendant's testimony. After hearing counsel's arguments, the court again ruled that the expert's testimony would be precluded, but stated it would listen to an offer of proof. The defendant declined to make an offer of proof. In response to the State's argument that the issue was waived because there was no offer of proof, the defendant argues that her objections preserved the

issue and that she was not required to perform a useless act, that is, making the offer of proof, to avoid waiver.

The defendant misapprehends the purpose of an offer of proof and the necessity for offers of proof in cases such as this one. The purpose of an offer of proof is to disclose the nature of the offered evidence for the information of the trial judge and opposing counsel, and to enable a court of review to determine whether exclusion of the evidence was appropriate. As a general rule, an offer of proof is required to preserve error on appeal unless a question shows the purpose and materiality of the evidence, is in the proper form, and clearly admits of an answer relative to the issues of the case. (*People v. Van Kampen* (1986), 147 Ill. App. 3d 181, 185.) In the case at bar, the question of whether the defendant suffered from the battered woman syndrome, and if so, what effect it had on her behavior, does not clearly admit of an answer relative to the issues. In fact, counsel for the defendant and the State were in sharp disagreement over the relevance of the expert's testimony, and the trial court ultimately determined the evidence was not relevant for purposes of the defendant's theory of defense, which was that she had nothing to do with the murder and did not believe the others' murder plots were real. Because the defendant failed to make an offer of proof, the trial court had no basis to alter its ruling and the record before us does not establish the purpose and materiality of the evidence. Accordingly, we conclude that the defendant's failure to make an offer of proof constitutes a waiver of the issue on appeal.

The defendant suggests that her expert's testimony at the sentencing hearing establishes the relevance of the testimony excluded at trial. She further suggests that it is appropriate for this court to examine that testimony to infer what the expert's trial testimony would have been. In support, the defendant calls our attention to *People v. Minnis* (1983), 118 Ill. App. 3d 345, wherein the court reviewed experts' reports attached to a post-trial motion to determine whether evidence of the battered woman syndrome was properly excluded at trial. We find a crucial distinction between *Minnis* and the case at bar to be that the trial court in *Minnis* denied defense counsel his right to make an offer of proof, making it necessary for the court to examine the supplemental materials to determine the relevancy of the offered testimony. The circumstances before this court are completely different. Although we are not similarly compelled to examine the expert's testimony at the sentencing hearing to determine whether it was properly excluded, we have done so and find no error in the trial court's ruling.

The battered woman syndrome is an emerging concept, and expert testimony concerning the syndrome has been admitted in a limited number of reported cases. (See Annot., 18 A.L.R.4th 1153 (1982).) Those courts which have permitted expert testimony on the syndrome have generally done so only in cases involving self-defense and only for the purpose of explaining why the abuse a woman has suffered causes her to reasonably believe that her life is in danger and that she must use deadly force to escape her batterer. (*Minnis*, 118 Ill. App. 3d at 356.) The defendant did not plead self-defense here, nor did she offer the expert testimony to explain why she had to use deadly force. The defense presented at trial was that the defendant heard Royark and Miller plotting the victim's murder, but was not involved in the plans and believed they were a joke. Thus, the expert's testimony about the battered woman syndrome was irrelevant to the issues of the case. The amount and type of abuse the defendant experienced, the degree to which she suffered from the battered woman syndrome, and the symptoms she exhibited were not relevant to her defense that she overheard the plans but did not take part in them or believe them to be serious. After reviewing the expert's testimony at the sentencing hearing in the context of the entire case, we find that the court did not err in excluding the offered testimony at trial.

■■ ■ The defendant next alleges that she was denied a fair sentencing hearing because she was forced to face two accusers: the State and codefendant Royark. Royark and the defendant were sentenced in a joint hearing, pursuant to a stipulation signed by both defendants and their attorneys and an attorney for the State. The defendant claims that although the State and the trial court repeatedly indicated that evidence adduced during Royark's portion of the hearing would not be considered against her, the trial court adopted the theory presented during Royark's portion and used it against her. The State maintains that the defendant waived this issue by stipulating to the joint hearing and, furthermore, the defendant was not prejudiced by the joint hearing.

Initially, we note that the defendant agreed to a joint sentencing hearing and thereby approved the procedural guidelines for the hearing as set out in the stipulation she signed. That the trial court would hear evidence regarding one defendant but would not consider it against the other was an integral element of the stipulation. In fact, a review of the record discloses that on several occasions during the joint hearing, the State reminded the court that evidence introduced against one defendant could not be considered against the other, and the court repeatedly indicated that it understood and would abide by

the restriction.

As is often stated in cases involving joint trials where the defenses of codefendants are antagonistic, a trial court, due to its unique training and experience, is generally believed to have a greater ability to restrict the use of improper evidence and to consider only competent evidence. (See, *e.g.*, *People v. Moore* (1984), 128 Ill. App. 3d 505, 514.) Furthermore, a trial court is presumed to consider only competent evidence in determining a sentence, and this presumption extends to the arguments of counsel. (*People v. Morgan* (1986), 112 Ill. 2d 111, 144, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329, *reh'g denied* (1987), 481 U.S. 1025, 95 L. Ed. 2d 519, 107 S. Ct. 1914.) Our careful review of the record convinces us that there is no support for the defendant's vague allegations that the trial court here abandoned its repeated assurances and considered evidence and arguments offered against Royark. The court's statements and findings are supported by the evidence and arguments presented at trial and during the defendant's portion of the sentencing hearing. Accordingly, there is no justification for vacating the defendant's sentence and remanding for a new sentencing hearing.

■ Finally, the defendant contends that the court incorrectly determined that the felony murder provision of the death penalty sentencing statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(a)(ii)) applied and she is therefore entitled to a new sentencing hearing. The State apparently concedes that the court improperly considered the felony murder aggravating factor, but contends that a remand for resentencing is not required because the court also based its ruling on other, properly considered factors.

The State notes that our supreme court has held that when it can be determined from the record that the weight placed on the improperly considered aggravating factor is so insignificant that it did not lead to a greater sentence, remandment is not necessary. (*People v. White* (1986), 114 Ill. 2d 61.) The State also relies on *People v. Barber* (1983), 116 Ill. App. 3d 767, a third district case, in support of its assertion that remandment is not required. In *Barber*, the defendant was sentenced to natural life imprisonment for murder because the crime was committed during the course of a felony and because the murder was accompanied by exceptionally brutal, heinous behavior. On appeal, this court reversed the underlying felony, but rejected the defendant's argument that a remand for resentencing was required because the trial court considered an improper factor in imposing the sentence. In *Barber*, this court stated, "If this was the only basis

upon which the trial court concluded that a life sentence was appropriate, then a remand would be in order. However, a review of the record indicates that the trial court imposed a natural life term of imprisonment upon the defendant due to its belief that the murder was 'accompanied by exceptionally brutal [and] heinous behavior indicative of wanton cruelty.' " (116 Ill. App. 3d at 779-80.) Finding that the trial court did not abuse its discretion in concluding that the brutal nature of the crime fell within the scope of the life imprisonment statute, this court affirmed the defendant's sentence.

This court's decision in *Barber* dictates that we reach a result contrary to that sought by the defendant. During the initial stages of the sentencing hearing, the court considered the statutory aggravating factors and found that the defendant was eligible for the death penalty because she committed murder pursuant to an agreement by which she was to receive money, because the murder was committed during the course of a felony, and because the murder was committed with the intent to prevent the victim from testifying in a criminal prosecution. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b).) After considering the evidence and arguments of counsel during the later stages of the hearing, the court discussed the factors in mitigation and found that they precluded imposition of the death sentence. The court then found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and stated, "[I]t will be a long time before the Court can expunge the sight of that bent water pipe from its mind." Noting that it also previously found other statutory aggravating factors to exist, the court imposed a term of natural life imprisonment.

After a careful review of the record, we find that the weight placed by the trial court on the improperly considered factor was not significant, and the three alternative grounds relied on, which the defendant does not dispute in this argument on appeal, amply support the sentence imposed. Having determined that the factor improperly considered did not result in a sentence greater than that which would have been imposed if the factor had not been considered, we, therefore, decline to remand the instant case for resentencing.

Based on the foregoing, we affirm the judgment and sentence of the circuit court of Mercer County.

Affirmed.

SCOTT and STOUDER, JJ., concur.