THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TONY LYNN ROYARK, Defendant-Appellant.

Third District No. 3—90—0017

Opinion filed June 20, 1991.—Rehearing denied July 24, 1991.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Roland Burris, Attorney General, of Springfield (Thomas L. Ciecko, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Defendant Tony Lynn Royark pleaded guilty to murder, armed robbery and conspiracy (to commit murder). The prosecution sought the death penalty, and the court found the defendant eligible for the death penalty, but declined to impose it. The defendant was sentenced to natural life for murder and an extended term of 60 years for armed robbery. Defendant moved to withdraw his guilty plea, vacate the judgment and reconsider the sentence. The court denied the post-trial motions except that the sentence for armed robbery was reduced to 30 years.

On appeal, this court vacated the order of the trial court denying the motion for leave to withdraw the guilty plea. This court held that trial counsel had failed to comply with the requirements for guilty pleas as outlined in Supreme Court Rule 604(d) (107 Ill. 2d R. 604(d)). We remanded for rehearing on that motion or any amended motion to withdraw the guilty plea.

On remand, the defendant filed an amended motion to withdraw his guilty plea. The trial court denied the motion. The defendant appeals. We affirm.

In the early morning hours of November 23, 1986, Kim Wayne Jackson was beaten to death in an unoccupied rural farmhouse he owned. On January 7, 1987, the victim's estranged wife, Janet Jackson, was charged with soliciting the murder. Additionally, Jackson, 16-year-old Michael Miller, and Tony Royark were charged with three courts of murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3), conspiracy (murder) (Ill. Rev. Stat. 1989, ch. 38, par. 8—2(a)), and armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)). Miller pleaded guilty to conspiracy and attempted murder and agreed to testify for the State. On May 18, 1987, the defendant pleaded guilty to all charges. At the hearing on that date, the trial court admonished the defendant of the rights he waived by entering the guilty plea, advised him of the range of possible sentences, and was assured by the defendant that his guilty plea was not induced by promises or threats made by the State, his attorney, or anyone else. The State recited the evidence it would present at trial, and the defendant tendered his plea. The court determined there was a factual basis for the plea and found the defendant guilty of all charges. The phases of the death

penalty hearing were explained, and Royark stated that he waived his right to a jury for the death penalty hearing.

The case against Jackson proceeded to jury trial. The evidence presented at the trial is more fully described in *People v. Jackson* (1989), 180 Ill. App. 3d 78, 535 N.E.2d 1086. For purposes of this appeal, a summary of the proceedings will suffice and is presented below.

The evidence at that trial tended to establish that Royark and Miller waited for Jackson to lure the victim to the Jacksons' rural farm on November 23, 1986, and, as part of a prearranged plan, beat him to death and took his wallet. Royark and Miller also took Janet's purse and hit her with a board to substantiate her claim that she and her estranged husband were attacked by an unknown intruder. The evidence at the trial also established that the threesome had been planning the victim's death for months and had made previous unsuccessful attempts to end his life. Royark and Miller had an ongoing sexual relationship, as did Miller and Jackson, and it appears that the three intended to live together as soon as it was practicable.

Kim Jackson had recently procured a $100,000 insurance policy which named his daughter and wife as beneficiaries. The testimony at trial suggested that obtaining the insurance proceeds was another one of the codefendants' motives for the murder. Additionally, Royark had been charged with arson in Iowa because he tampered with the gas pipes beneath the trailer in which the victim resided after he moved out of the marital residence. The victim was a witness to the crime, and some of the testimony at the murder trial indicated he was killed, in part, to prevent him from testifying against Royark.

While Janet Jackson testified that she did not conspire to murder her estranged husband or know that Royark and Miller would be waiting at the unoccupied farmhouse to murder him, other testimony suggested that she actively directed and participated in the activities in this murder plot and the previous unsuccessful ones. The jury found Jackson guilty of solicitation, conspiracy, murder, and armed robbery.

On June 10, 1987, Royark, Jackson, their attorneys, and counsel for the State signed a stipulation governing procedures to be employed in the defendants' death penalty hearing. As to Royark, the stipulation provided that the court would consider the evidence adduced at Jackson's trial in its determination of whether he was eligible for the death penalty (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)) and in its determination of whether the penalty should be imposed (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c)). The stipulation further provided that all parties would be permitted to introduce additional evidence

during the penalty phase of the hearing, but evidence offered against Jackson at the hearing would not be considered against Royark.

The trial court determined that Jackson was eligible for the death penalty and then considered Royark's eligibility. The State called Michael Miller, who testified that he met Royark in 1984. Miller said they were initially friends and co-workers, but they began a sexual relationship approximately three months after they met. Miller stated he had sex with men Royark introduced him to, and the men gave him money, some of which he gave to Royark. Upon cross-examination concerning his testimony at trial, Miller indicated that although the plans to murder the victim had been discussed for several months, they did not become serious until after Royark was arrested for arson. Miller testified that Jackson told Royark to take the victim's wallet.

Next, evidence was introduced on Royark's behalf. Several character witnesses testified to Royark's good character and the high quality of work he performed.

Eugene VanDriel, the Iowa attorney Royark retained to represent him on the arson charges filed after he tampered with the trailer's gas lines, also testified. He stated that on November 21, 1986, two days before the murder, Royark entered into a plea agreement under which a charge of arson would be dismissed and, in exchange, Royark would plead guilty to a lesser offense. The State was to recommend supervised probation in a residential facility. The attorney testified that the agreement was never finalized and that the case remained pending. Concurrence of the court was a condition of the plea. Royark was not scheduled to enter his guilty plea in court until the first week of December, which was, of course, after the events of November 23 herein.

Royark took the stand in his own behalf. He testified that as a child, his home life was unstable and that two of his older brothers sexually abused him for several years. He stated he dropped out of school after seventh grade, but obtained a General Educational Development degree.

Royark testified about meeting Miller, who was a male prostitute. He stated that he was initially bothered by Miller's sexual relationship with Jackson, and told the court that eventually he and Jackson agreed they would continue their relationships with Miller and the three of them would live together someday. Royark told the court that Miller was afraid of the victim, who was 6 feet 4 inches tall and weighed over 300 pounds. The victim had harmed Miller several times while wrestling with him.

Royark testified that he tampered with the gas pipes under the trailer because Jackson repeatedly told him he had to "do something" or her husband would kill him and Miller. He testified that on November 22, 1986, Jackson, Miller and his brother, and the victim's brother came to his house, where they discussed plans to murder the victim. Jackson said she could get her husband to their rural farm and the others could beat him. Royark explained the events leading up to the murder and stated that he and Miller struck the victim with pipes. At Jackson's insistence, they struck her, too, and took her purse and the victim's wallet before they left. Royark said he expected the victim to have money, but took it only to make the police think there had been a robbery. He stated that, after the murder, Jackson mentioned the victim had insurance.

Two psychiatrists who examined Royark and Jackson testified at the hearing. The experts offered different diagnoses of Royark. The State's expert testified that Royark suffered from adult antisocial behavior disorder, while the defense expert indicated that Royark was a weak, altruistic person, who was easily manipulated but could be rehabilitated. They agreed that Royark genuinely loved Miller and participated in the murder to protect him.

The trial court determined that Royark was eligible for the death penalty because the murder was committed pursuant to an agreement by which the defendant was to receive money (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(5)), the victim was killed during the course of another felony (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)), and the defendant murdered the victim with the intent to prevent him from testifying in a criminal prosecution (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(8)). The court also found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The court determined that sufficient mitigating circumstances existed to preclude imposition of the death sentence and imposed a sentence of natural life imprisonment for the murder. The court imposed a term of 60 years for armed robbery.

On June 30, 1987, Royark's trial counsel filed a motion to withdraw his guilty plea and vacate the judgment and a motion to reconsider the sentence. The motion to withdraw the guilty plea alleged that Royark's sentence was excessive and disproportionate to those of Jackson and Miller. In the motion to reconsider, Royark alleged that the court failed to fully consider certain mitigating factors and that the sentence was excessive. Arguments on the motions were heard on July 7, 1987. The court reduced the armed robbery sentence to a term

of 30 years and denied the remaining requests for relief. The defendant appealed.

On appeal, this court held that defendant's trial attorney failed to file the requisite Rule 604(d) certificate, failed to consult with his client prior to filing the motion to withdraw guilty plea, and did not have the opportunity to review a transcript of the plea hearing before filing the motion to withdraw guilty plea. This court, in an unpublished order under Supreme Court Rule 23 (107 Ill. 2d R. 23), remanded the cause for a hearing on defendant's motion to withdraw guilty plea and directed that new counsel be appointed and that an amended motion be filed if necessary.

When this case was remanded, the Mercer County public defender was appointed to represent defendant. Finding a conflict of interest, the circuit court disqualified the Mercer County public defender and appointed the Rock Island County public defender to represent defendant.

Nine days later, William Schick, the Rock Island public defender, met defendant and appeared before the trial court. Defendant told counsel to ask for two attorneys because he "read somewhere" he could ask for them. Schick did ask the trial court, and this request was denied. None of defendant's subsequent allegations, regarding his motion to substitute counsel, apply to Schick.

During the time defendant was represented by the Rock Island public defender's office, he clearly wanted private counsel. He wanted, in fact, two attorneys.

In early August 1989, David Hoffman, of the Rock Island public defender's office, took over the case. Two days later, Hoffman came to see defendant. Defendant pressured him into filing a motion to substitute the trial court judge. Hoffman did not agree that filing the motion would serve any purpose other than to upset the judge. Defendant wanted Hoffman to raise every issue he (defendant) could think of, while Hoffman wanted to narrow the issues in the motion to withdraw defendant's guilty plea. Defendant was displeased that Hoffman did not talk to him for three days. When defendant and Hoffman spoke, defendant was adamant about filing the motion to substitute judges. Hoffman finally agreed, only to have defendant begin to argue with him over the specifics of the motion. During this time, defendant told Hoffman that his appellate counsel was available and had offered to help in his behalf.

When the motion to substitute was heard and denied, defendant was upset because he was not allowed to testify or allowed to change from his "jail clothes." Defendant further became upset because Hoff-

man didn't come to see him for two days. During this time, defendant was being advised by his appellate counsel to file certain objections. During the next few weeks, defendant constantly called Hoffman with requests about his transcripts and motions he wished filed.

Displeased with Hoffman's conduct of his case, defendant filed a *pro se* motion to appoint counsel other than the public defender. Hoffman came to see defendant. Defendant denounced Hoffman's representation and terminated the meeting.

Defendant's motion and affidavits, in essence, alleged Hoffman showed no interest in his case; had not read his transcripts; had not talked to him about his issues; missed appointments; failed to return his phone calls; and lied to him.

In response, Hoffman filed a motion to withdraw as defendant's counsel, stating if he responded to defendant's allegations he would create a conflict, and further meetings with defendant would only be twisted to provide new allegations for defendant.

At the hearing on defendant's motion, defendant told the trial court "I think it's pretty clear that things are not being done when they should be. I can never get a hold of him *** the motions I wanted to file were never filed. I had to file them myself." Hoffman did not want to respond to the allegations because he feared it would create a conflict with the defendant. He finally wanted to respond, but the trial court saw no purpose in a response. Hoffman related a pattern of defendant's refusal to cooperate with him and attempts to interfere with Hoffman's representation.

At the conclusion of the October 19, 1989, hearing, the trial court remarked:

> "This matter is of deep concern for me for a number of reasons. Probably the most significant is that I not only know Mr. Hoffman's reputation from his multiple appearances in this Court and I not only know of his ability from multiple appearances in this court, but I know of his statewide reputation as well, as a former judge and as an outstanding public defender in the State of Illinois.
>
> I know from his reputation that there are few better qualified defense attorneys in the State of Illinois and it is of great concern to me that either his, either his integrity or his ability is impugned.
>
> \* \* \*
>
> Mr. Hoffman, your motion, as painful as it is to me, and to Mr. Hoffman, Mr. Hoffman's motion to withdraw as counsel is also denied."

Defendant then made an oral motion to proceed *pro se* which was not considered by the court.

Defendant filed a "second amended" motion to withdraw guilty plea. The motion alleged that the plea was involuntary as a result of ineffective assistance and promises, false information, and coercion; trial counsel had a conflict of interest; defendant had a hearing problem; there was insufficient evidence of an armed robbery; one or more of the death-eligibility factors on which the trial court had relied did not exist; two of the death-eligibility factors were based on the same conduct and should have been considered as only one factor; the sentence was excessive; and no presentence report was filed.

The State filed a response, and at a hearing on the motion, the defense produced testimony from Royark and trial defense attorney Karl Bredberg.

Bredberg related that he had farm business dealings with Janet and Kim Jackson. He had filed a lawsuit against them which remained pending in November 1986. In his capacity as an attorney he had never represented the Jacksons in any matter.

The defendant testified that he had been unaware of a current legal relationship between his attorney and his codefendant and the victim of the crime. His attorney had misled him about his sentence. His attorney told him that the judge had referred to this as a case involving a 50-year term and that the judge had actually offered a 30-year term if defendant pleaded guilty. Thus, the defendant pleaded guilty only because he thought he had been promised a 30-year term. He denied the existence of that promise when asked about it by the judge at the May 18, 1987, hearing when he pleaded guilty only because "I was told that was the way things were done. You made an agreement or whatever and you go in and you answer the questions the right way and then you plead guilty." His understanding was that the judge denied being a part of that promise when he admonished him from the bench since, "I thought that's just the way it was done for the record." Part of his reason for pleading guilty was to escape the possible subsequent filing of sex crime charges. His attorney never told him he was eligible for death until after he had pleaded guilty. The defendant indicated that he would never have pleaded guilty if he had known he was getting a term of natural life imprisonment. Defendant further asserted that he never waived his presence at any proceeding. The defendant denied killing Kim Jackson and denied being present at the time of Kim's murder. He alleged that his attorney had failed him in several other ways, too: failed to discuss many documents in the record with him, failed to discuss which charges were "death penalty

enabling" or the theory of accountability and failed to make him understand that he was waiving an appeal. Finally, the defendant explained that he needs hearing aids in both ears, but did not possess any hearing aids at the time of the plea.

The defense called Jackson but her testimony was disallowed as hearsay. As an offer of proof, the defense showed that Jackson would have testified that before she and the defendant had been sentenced, the defendant told her that Bredberg had told him that he would receive not more than 50 years if he pleaded guilty.

The prosecution recalled Bredberg to show that he acted effectively and had fully informed the defendant to enable him to make a voluntary and intelligent decision about pleading guilty. Bredberg, the only public defender in Mercer County, had represented 720 to 800 defendants from 1978 to 1987 and litigated two to three jury trials a year. He saw the defendant almost daily from the time of appointment and considered this the most time-consuming case he ever undertook. He knew this was a death penalty case and conveyed this to Royark many times before the defendant decided to plead guilty. Bredberg felt the defendant did not want to face the prospect of death and always felt that the prosecution would change its mind. Bredberg hoped that if the defendant entered a plea very early, he might be able to draw a sentence in the 30- to 50-year range. However, the prosecution never offered anything less than death and refused to waver in that position. He told the defendant that, based on the discovery, it was his opinion that the death penalty was a likely outcome unless he made an open plea at which time it would be up to the judge. He never told the defendant that the judge had promised or even indicated an intention to impose a sentence in the 30- to 50-year range, and he never told the defendant that he better plead guilty to escape the filing of additional charges. The defendant was present for every major decision and court appearance, and Bredberg showed him a copy of everything that had been filed in court. There was never any agreement with the State about an 80-year sentence because the prosecutors from the Attorney General's office were not present; anyway, the defendant had rejected it. The defendant had admitted to the charged crimes. In fact, the defendant had given a statement that Bredberg had tried to suppress, but because it wasn't suppressed, the statement eliminated most of the alternatives. He had made it clear to the defendant that his later statements were inconsistent with his former and this would be a large hurdle to overcome at trial.

During argument, the defense urged that the plea was involuntary because Bredberg had not told the defendant that a guilty plea would expose him to the same sentence as had he gone to trial. Instead Bredberg "promised" the defendant that if he went to trial and lost he would get the death penalty; yet, if he pleaded guilty, he would not. This promise arose, according to the defense, simply because Bredberg felt better about his client pleading guilty than going to trial. Further, Bredberg failed to discuss with Royark the possibility of eliminating the armed robbery charge at trial, thereby negating application of the death penalty. There was no indication why the defendant would have rejected the offer of 80 years.

The prosecution argued that the defendant knew everything he needed to make a voluntary decision to plead guilty. Counsel had met with him 48 times.

The judge denied the motion that same day. He stated that some of the allegations in the amended motion fly in the face of a very complete record that had been witnessed by a number of people, including the defendant and his attorney. The defendant appeals, raising several issues for review.

Royark initially contends that the trial court abused its discretion in rejecting his attempt to substitute counsel. Royark argues that this court should vacate the ruling of the trial court denying his motion to withdraw his guilty plea and remand for a new hearing with direction that new counsel be appointed to represent him. We reject this argument.

■ The case law makes it clear that an indigent defendant has no right to select his own counsel absent a showing of good cause. (*People v. Sylvester* (1979), 71 Ill. App. 3d 130, 132, 389 N.E.2d 601, 602.) Absent a showing of good cause, it is within the discretion of the trial court to deny a request for substitute counsel. *People v. Gornick* (1982), 107 Ill. App. 3d 505, 510, 437 N.E.2d 892, 896.

Royark advances two arguments in support of a "good cause" theory. First, he claims that the deterioration in his relationship with Hoffman constituted good cause. Second, citing *People v. Stoval* (1968), 40 Ill. 2d 109, 239 N.E.2d 441, Royark argues that the combination of his motion for substitution of counsel and Hoffman's motion to withdraw placed him in an adversary posture against attorney Hoffman. This, Royark maintains, was a *per se* conflict of interest obviating any requirement of a showing of prejudice.

■ Responding to Royark's first argument, the fact that an appointed attorney and his client bicker between themselves does not require a court to grant a motion for new counsel. (*Sylvester*, 71 Ill.

App. 3d at 132, 389 N.E.2d at 602-03.) Accordingly, we reject defendant's argument that, based on his showing of disagreement between himself and Hoffman concerning representation and tactics, there existed automatic good cause grounds for substitution of counsel.

■ Concerning Royark's second argument, this case is distinguishable from *Stoval*. *Stoval* involved a defendant represented by appointed counsel whose law firm was currently representing the jewelry store owner and the business allegedly victimized by the defendant. "The progeny of *Stoval* \*\*\* have interpreted the *per se* rule to apply only 'where counsel's conflict of interest arises from a commitment to others,' and has not applied or adopted the rule where a conflict arises in another fashion." (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 533, 362 N.E.2d 14, 18, quoting *People v. Fuller* (1974), 21 Ill. App. 3d 437, 442, 315 N.E.2d 687, 690-91.) Accordingly, we reject Royark's *per se* argument.

With that said, we turn now to the question of whether the trial court abused its discretion in denying Royark's motion. In *People v. Jackson* (1981), 100 Ill. App. 3d 318, 426 N.E.2d 1132, the appellate court stated:

> "To permit every defendant in every case to change counsel without good cause would result in judicial chaos. Therefore, the rule has necessarily evolved that cases of this type must each be carefully considered with due regard for the facts involved. Then, it is necessary to classify each particular case as either a legitimate exercise of a constitutional right or as an unnecessary exercise in futility. As we would expect, the matter is one which is left to the sound judicial discretion of the trial court." *Jackson*, 100 Ill. App. 3d at 323-24, 426 N.E.2d at 1137.

■ The record in this case reveals that the trial judge who ruled on this motion is the same judge who handled much of the case from the outset. The record further reveals that appointed counsel, despite difficulty with this particular defendant, filed necessary motions, represented the defendant at hearings and vigorously protected his rights. The trial court's decision was not an abuse of discretion.

Royark next contends that his sentence should be vacated and he should be allowed to withdraw his guilty pleas and plead anew because he received ineffective assistance of counsel which rendered his guilty pleas involuntary. The defendant's arguments are that his trial attorney was "ill-equipped" to represent a defendant in a capital case, that his attorney encouraged him to plead guilty based on a false notion as to the benefits of pleading guilty as opposed to proceeding to

trial, and that counsel failed to apprise him of all of the consequences of his pleas. We disagree.

Defendant's public defender, Karl Bredberg, had been the public defender in Mercer County for nearly 10 years. During that time, Bredberg prepared, investigated in preparation for trial and proceeded to trial in nearly 800 cases. Several of these were jury trials where Bredberg defended clients charged with felony offenses. Many were guilty plea cases. Although Bredberg had not defended a client charged with a capital offense, he sought the assistance of the Capital Unit of the State Appellate Defender's office. He conferred with that office and reviewed a manual sent to him.

Bredberg met with defendant daily from his appointment to the date defendant pleaded guilty, a total of 48 meetings. Bredberg followed up on every investigative lead given him and hired a psychiatrist for the case. Bredberg testified that it was the most time-consuming case he had ever had "by at least a factor of ten."

■ While it is true that Bredberg had never represented a defendant charged with a capital offense, it is clear that he was an experienced criminal defense attorney. Every experienced capital defense attorney once tried his first capital case. Given the factors of this case, particularly Royark's statements to the police, the expected testimony of codefendant Miller, and the brutal and heinous nature of the crime, the true measure of Bredberg's competence in handling this case is that Royark did not receive the death penalty.

Royark's second argument is that Bredberg encouraged him to plead guilty based on a false notion of the benefits of a guilty plea.

The record reveals that Bredberg was ready to try the case. Although he had counselled Royark to plead, he was ready, willing and able to make the best defense possible. Royark himself chose to plead guilty. Bredberg's theory that the court would not impose the death penalty if Royark pleaded guilty proved true.

Finally, in a last attempt to show Bredberg was ineffective, defendant alleges counsel failed to explain that a guilty plea waived certain issues for appeal and failed to discuss the potential sentence of life imprisonment. He cites no support for his allegation that this renders Bredberg ineffective.

■ Whether a defendant has received effective assistance of counsel has two components: deficiency and prejudice. A defendant must prove that the performance of his counsel was so lacking, his errors so grave, that he was not functioning as the counsel guaranteed by the Constitution; and those errors so prejudicial to defendant as to deprive him of a fair trial. (*Strickland v. Washington* (1984), 466 U.S.

668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Caballero* (1989), 126 Ill. 2d 248, 260, 533 N.E.2d 1089, 1091.) In the context of a guilty plea, a defendant cannot satisfy the prejudice requirement without demonstrating that counsel's ineffective assistance actually affected the outcome of the plea proceeding. (*Hill v. Lockhart* (1985), 474 U.S. 52, 59, 88 L. Ed. 2d 203, 210, 106 S. Ct. 366, 370.) There must be a reasonable probability that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 59, 88 L. Ed. 2d at 210, 106 S. Ct. at 370.

■■ When defendant pleaded guilty, Bredberg was asked if he had discussed the possible consequences of a guilty plea with defendant. Bredberg said "yes." Defendant later admitted he knew he was eligible for the death penalty before he pleaded guilty. It was Bredberg's opinion that a death sentence was more than probable if defendant went to trial. He knew that even with a plea of guilty, the State would seek death, but believed that the defendant would end up with less.

Aside from defendant's assertion that he would not have pleaded guilty if he had known he could have received life without parole or death, defendant provides no allegations detailing the reasons why he would have insisted on going to trial. He cannot support an allegation on conclusory assertions unsupported by specific facts. Thus, defendant fails to show either component necessary to succeed here.

■■ Finally, defendant, relying on this court's opinion in *People v. Stoneking* (1990), 193 Ill. App. 3d 98, 549 N.E.2d 931, suggests that because he was not admonished as to the applicable sentence he might receive, he should be allowed to withdraw his guilty plea. In *Stoneking*, this court held that because the trial court had failed to inform the defendant that life imprisonment meant that he was not eligible for parole and there was no evidence in the record indicating the defendant knew he could not be paroled, his motion to withdraw his guilty plea should have been granted. The holding in *Stoneking* was based on the requirement that a defendant be informed of the maximum penalty he faces by pleading guilty. Here, defendant was advised:

> "[T]he prima facie case would make this a capital offense and under the circumstances this defendant could be executed or given a sentence of life in prison."

Defendant acknowledged the possible penalties. Thus, he knew the maximum penalty he faced—death. At the hearing on his motion to withdraw his guilty plea, he acknowledged that he knew he was eligible for the death penalty. It did not surprise him when the State con-

tinued, after his plea, to ask for death. The State vigorously pursued the death penalty. Defendant is hardly in a position to claim he was not informed of the maximum penalty he was facing. Accordingly, Royark's second argument is rejected.

Royark's third argument contends that his sentence should be vacated and he should be allowed to withdraw his guilty pleas and plead anew. Royark argues that his guilty plea to armed robbery, which made him eligible for the death penalty, should not have been made because the evidence is insufficient to establish guilt. We disagree.

■ The measure of proof necessary to establish a factual basis for a plea is less than that required to sustain a conviction after a trial. (*People v. Barker* (1980), 83 Ill. 2d 319, 327, 415 N.E.2d 404, 408; *People v. May* (1975), 25 Ill. App. 3d 1, 3, 322 N.E.2d 606, 608.) All that is required to appear on the record is the basis from which the court could reasonably make the decision that the defendant actually committed armed robbery. *Barker*, 83 Ill. 2d at 327-28, 415 N.E.2d at 408.

The information in this case charged defendant with armed robbery "in that [he] while armed with a dangerous weapon, a metal pipe, took property, being approximately $110.00 United States currency, from the person of Kim Wayne Jackson, by the use of force." In the factual basis presented at the guilty plea hearing, it was stated that defendant struck the victim repeatedly in the head with a metal pipe, forcing him to the floor, and then went through his pockets and removed an amount of currency. It cannot be seriously disputed that the information properly charges the offense of armed robbery, and that the factual basis provides reasonable support for every material allegation in the information.

■ Defendant relies primarily on *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, and argues that the distinction between armed robbery and theft is a matter of intent: if fatal force is used against the victim solely for the purpose of killing, then the subsequent taking of property is a theft, not a robbery. The difficulty with this argument is that the information charging armed robbery does not contain an allegation concerning why defendant used force against the victim, it simply alleges that he was armed with a pipe, that he took property from the person of the victim, and that the taking was effected by the use of force. Thus, defendant finds it necessary to turn elsewhere for evidence of his intent, and he turns to the record of his codefendant's trial. However, in pleading guilty, defendant waived all the rights exercised by his codefendant when she went to trial, including the rights to require the State to prove its charge

and to present a defense, and he may not now rely on the evidence produced at that trial to impeach the charge he admitted and the factual basis he stipulated to. To the extent that the factual basis presented at the guilty plea hearing indicates that the purpose of the assault on the victim was to kill him, it also indicates that the taking of whatever money was on his person was part of the preconceived plan. The intent to use deadly force against the victim to disable him and prevent him from resisting does not make the subsequent taking of his property less than robbery. *People v. Washington* (1984), 127 Ill. App. 3d 365, 377, 468 N.E.2d 1285, 1294.

 This is not a case like *Tiller*, where there was no intent to take property from the victim at a time before or proximate to the application of force. The record therefore contains reasonable support for the armed robbery conviction, and defense counsel did not render ineffective assistance in counseling defendant to plead guilty to that charge.

It also bears remembering that armed robbery does not require specific intent. *People v. Lamprey* (1979), 79 Ill. App. 3d 1065, 1068, 398 N.E.2d 1076, 1078.

Royark's next issue questions whether the three eligibility factors rendering him eligible for the death penalty were shown beyond a reasonable doubt.

 Our review of the record reveals that all three of the death penalty eligibility factors (contract murder, felony murder predicated on armed robbery and witness murder) were proven beyond a reasonable doubt. In addition, the trial court found that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and sentenced the defendant to life imprisonment pursuant to section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b)). Accordingly, the court did not err in finding the defendant eligible for, and subsequently sentencing him to, life imprisonment.

We note that the defendant raises two additional issues. We have reviewed the record and considered the parties' arguments. We find the issues to be without merit.

For the reasons listed above, the circuit court of Mercer County is affirmed.

Affirmed.

McCUSKEY and SLATER, JJ., concur.