**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200025-U

Order filed July 16, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0025 Circuit No. 16-CF-2532 |
| | ) | |
| NATHAN R. MASLAN, | ) ) | Honorable Daniel Rippy, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justices O'Brien and Schmidt concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court properly granted defendant's motion to suppress defendant's statements.

¶ 2     The State appeals the Will County circuit court's order suppressing various statements made by defendant, Nathan R. Maslan. The State argues that the police officers' questioning was general on-the-scene questioning that did not require *Miranda* warnings and that regardless, defendant was not in custody and thus, *Miranda* warnings did not need to be given. Additionally,

the State challenges the court's finding that defendant's statements were involuntary. We affirm in part, reverse in part, and remand.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant by a superseding bill of indictment with two counts of aggravated driving while under the influence (625 ILCS 5/11-501(a)(1), (a)(2), (d)(1)(F), (d)(2)(G) (West 2016)), six counts of reckless homicide (720 ILCS 5/9-3(a), (d)(2) (West 2016)), and one count of aggravated use of an electronic communication device (625 ILCS 5/12-610.2(b-5), (e) (West 2016)). The charges arose from an incident where defendant struck a pedestrian with his motor vehicle, killing the pedestrian.

¶ 5        Defendant filed a pretrial motion to suppress various statements he made to the officers at the scene of the incident. The motion to suppress alleged that defendant should have been given *Miranda* warnings because he was in custody when the officers questioned him.

¶ 6        The State opposed the motion to suppress, arguing that it was not necessary for defendant to be Mirandized because the questioning was part of the officers' general on-the-scene investigation and that regardless, defendant was not in custody. Additionally, the State sought a determination that the statements made by defendant were voluntary.

¶ 7        The evidence presented at multiple hearings on the motion to suppress established that at 2:50 a.m. on August 20, 2016, defendant called 911 and reported that he "hit a person" who was "walking on the side of the street." Defendant "clipped him with my, uh, mirror, but I didn't see him when he came out." Later in the call, defendant said the pedestrian "kind of like popped up in the middle of the street all of the sudden, well not middle of the street, but on the side of the road and I clipped him."

2

¶ 8       The incident occurred in Frankfort Township. The Frankfort Fire Protection District ambulance arrived within minutes of the call. Will County Sheriff's Department Deputies Shaun Moran, Brad Parker and Kevin Spencer and Sergeant Jill Knutsen arrived shortly thereafter, within approximately 10 minutes of each other. Moran was present at the scene for approximately five minutes before leaving to accompany the ambulance transporting the fatally injured pedestrian to the hospital. Will County Sheriff's Department Deputies Andrew Schwartz, William Hetfleisch, Michael Cosentino, and Sergeant Vincent Gambino arrived at the scene between 4 and 4:20 a.m.

¶ 9       Defendant left the scene in the back seat of Schwartz's vehicle at 4:31 a.m. Schwartz took defendant to the hospital for a blood draw, after which defendant was charged. No officer advised defendant of his *Miranda* rights while at the scene.

¶ 10                                    A. Deputy Brad Parker

¶ 11      Deputy Parker testified on June 18, and August 26, 2019. Parker testified that he responded to a call of a motor vehicle collision resulting in fatal injuries to a pedestrian. Shortly after arriving on scene, at approximately 3:02 a.m., Deputy Parker made contact with defendant, the driver of the vehicle. Parker asked defendant what occurred, and defendant "stated that while he was driving northbound on 80th Avenue, he observed the pedestrian stumble within the roadway, causing him to strike the pedestrian." Defendant was coming from the Aqua Lounge, which is a bar located very close to where the incident occurred. Defendant told Parker that defendant had consumed four to five beers. Defendant changed his story and next said:

> "while he was proceeding northbound on 80th Avenue, he was trying to attempt
> to attach his phone to the Bluetooth, his car to the Bluetooth, so that he could
> listen to music, and when he was doing so, he took his eyes off the roadway and

3

veered to the right, which is the east side of the road, into the gravel portion of where the pedestrian was walking, striking the pedestrian."

¶ 12 After this initial questioning, "due to the extent of the incident, the defendant accompanied [Parker]" to Parker's squad car where Parker put defendant in the back seat. Parker explained that "it's a very dimly-lit roadway, and [Parker] didn't want to have another accident occur." Parker placed defendant in the squad car "until [the deputies] could complete [their] further investigation." Parker did not tell defendant that defendant was the focus of the investigation or that defendant was a suspect. Defendant was not handcuffed, and Parker never drew a weapon. The back doors in Parker's squad car were locked from the inside, such that one could not get out from inside the vehicle. The squad car windows were up. Parker checked on defendant while defendant was in the squad car to see if defendant needed anything. Defendant "would just relay that he was concerned about the pedestrian's well-being."

¶ 13 Parker did not believe he touched defendant other than to search defendant for weapons prior to putting defendant in the squad car. Before searching defendant, Parker told defendant that he had "to complete a protective pat down prior to getting into the vehicle just for any weapons or whatnot." Although Parker stated he searched defendant to look for any weapons, Parker also testified that the search he conducted was no different than he would have done if he had placed someone under arrest. Parker did not recall if he removed any items from defendant's person, such as keys or a phone. Parker later stated that defendant did not have anything on his person. When Parker was shown a property report that Parker generated, he acknowledged that at some point he would have had possession of defendant's keys, including the vehicle ignition key. Parker ultimately admitted he did not recall the details of the search.

4

¶ 14    No one else was with Parker when Parker had the conversation with defendant. Parker indicated his conversation with defendant lasted approximately 15 to 20 minutes. Parker had a conversational tone while speaking with defendant. Parker did not recall directing defendant's attention to the rear passenger side tire of defendant's vehicle and asking defendant how the gravel dust got on the tire. Parker could not recall a lot of the particulars from the night of the incident and stated he had a vague recollection.

¶ 15                    B. Deputy Andrew Schwartz

¶ 16    Deputy Schwartz testified that he responded to a call reporting a pedestrian had been struck by a vehicle. Upon arrival, Schwartz spoke with the other officers on scene, Parker and Knutsen. Both officers provided Schwartz with a brief summary of the information gathered by the officers, such as: the people involved, what they observed, what the driver told the officers and what the paramedics told the officers about the condition of the injured pedestrian.

¶ 17    At approximately 4:10 a.m., Schwartz spoke with defendant, who was waiting in the back seat of Parker's squad car. Schwartz opened the door and stood next to the open door while he spoke with defendant. Defendant remained seated in Parker's squad car while Schwartz spoke with him. The conversation was cordial and lasted approximately two or three minutes. Schwartz did not touch defendant and did not have any weapons drawn.

¶ 18    Schwartz asked defendant a few brief questions about the incident. Defendant relayed to Schwartz that defendant was driving away from the Aqua Lounge and heading to his home. Defendant told Schwartz he was trying to pair the Bluetooth on his cell phone with the radio in his vehicle in order to play music. At some point, defendant "realized that he was on the gravel shoulder, looked up, and saw what he believed was a person standing near the side of the road." Defendant attempted to avoid striking the person. However, defendant thought he hit the

5

pedestrian with the front right of the vehicle. Defendant said he had "[a]pproximately four beers since—since 11:30 that night" and that he finished his last beer several minutes before leaving the Aqua Lounge. The collision happened approximately five minutes after he left the Aqua Lounge.

¶ 19     Toward the end of the conversation with defendant, Schwartz administered a preliminary breath test to defendant. The test measured defendant's blood alcohol concentration (BAC) as 0.083. Schwartz did not believe that he told defendant the results. Schwartz testified that at that point in time, defendant was not free to leave.

¶ 20                              C. Deputy William Hetfleisch

¶ 21     Deputy Hetfleisch testified that he was called to the scene by his supervisor, Sergeant Gambino. When Hetfleisch arrived, he spoke with Parker. Parker provided Hetfleisch with basic information such as the location of the pedestrian and where the pedestrian had been taken. Hetfleisch did a quick evaluation and walk-through of the scene. Schwartz advised Hetfleisch that Schwartz had briefly talked to defendant and then administered a portable breath test. Schwartz told Hetfleisch the results of the test and Schwartz, Gambino and Hetfleisch all spoke together. Hetfleisch then spoke with defendant at approximately 4:25 a.m.

¶ 22     When Hetfleisch spoke with defendant, defendant was sitting in the back seat of Parker's squad car and Hetfleisch stood in the doorway. Gambino and Schwartz were in the vicinity but Hetfleisch approached defendant alone. Hetfleisch advised defendant that while defendant had spoken to others, Hetfleisch needed to ask defendant questions as well. Hetfleisch asked defendant his name and date of birth. After defendant provided that information, defendant "made the statement of, 'I am the asshole who hit that guy.' " Hetfleisch then asked defendant where he was coming from and about his alcohol consumption that night. Defendant told

Hetfleisch that he was coming from the Aqua Lounge and that he had consumed three quarters of a beer. Prior to that, defendant was at the Side Street Tavern in Tinley Park and had consumed three beers. Defendant told Hetfleisch that defendant wished he had stayed at a hotel near the Side Street Tavern.

¶ 23    Hetfleisch next asked defendant about the moments before the collision. Defendant told Hetfleisch that he was "connecting to his Bluetooth to select a song from iTunes, at which time he struck the pedestrian. He stated to [Hetfleisch] that he did not identify the pedestrian prior to striking him." Defendant then stopped his vehicle, checked on the pedestrian, and called 911. Defendant picked up his passenger-side mirror and placed the mirror inside his vehicle.

¶ 24    The tone of Hetfleisch's conversation with defendant was relaxed. Hetfleisch did not touch defendant while they were conversing. Defendant was not handcuffed during the conversation. The conversation lasted less than five minutes. After this conversation, Hetfleisch spoke with Gambino. Schwartz transported defendant to the hospital for blood and urine testing.

¶ 25                                    D. Defendant

¶ 26    Defendant testified that on the night of the incident, Parker arrived on the scene, exited his vehicle, and approached defendant's vehicle. As Parker approached, defendant was standing behind defendant's vehicle. Parker's squad car emergency lights were still flashing at that time. Defendant introduced himself to Parker and told Parker that he was the person who called 911 and identified himself as the driver of the vehicle involved in the incident. Upon request, defendant provided his license to Parker. Defendant told Parker his insurance card was in the center console of his vehicle and said he would get it. Parker told defendant no and stated that Parker would retrieve the insurance card from the vehicle. Parker asked if defendant had any

7

weapons or drugs in the car. Parker opened defendant's door, removed items from the center console, and placed those items on the front passenger seat of defendant's vehicle.

¶ 27    Parker then asked where defendant was coming from and going to. Defendant told Parker he was coming from Club 30[1] and was going home. Parker asked defendant how the occurrence happened. Defendant "said I was driving home down 80th Avenue, I saw a pedestrian on the side of the road stumble into my lane of travel. I swerved to try to avoid him and clipped him with my mirror." Defendant admitted this version of events was not true, but he told Parker this because he panicked. Defendant then asked Parker if he could drink water from a bottle in defendant's vehicle, but Parker told defendant he could not.

¶ 28    Next, Parker walked around defendant's vehicle, looking at it. After Parker circled the vehicle, he spoke to defendant again. Defendant testified that Parker told him to look at the rear passenger tire and then asked defendant why there was gravel dust on the tire. Defendant "said what happened was I took my phone out to play a song, I felt a big bump. I looked up, saw the pedestrian, cut my wheel hard left to try to avoid him and clipped him with my mirror."

¶ 29    After this exchange, Parker told defendant to turn around and put his hands on the back of the vehicle. Parker asked defendant if he had any weapons and after defendant replied that he did not, Parker searched defendant. Defendant described the search, stating that "[Parker] started with my shoulders, patted down my shirt area. [Parker] went into my left shorts pocket, took out my money clip and my keys and put them on top of [my vehicle]." Parker then went to defendant's right pocket and took out defendant's cell phone and put it on top of defendant's vehicle. Parker gave defendant the money clip but did not give defendant the cell phone or keys.

_____

[1]Testimony during the hearings established that Club 30 and Aqua Lounge were different names for the same establishment.

After Parker completed the search of defendant, Parker grabbed the back of defendant's right arm and "[s]aid you're going to have a seat in the back of my squad." Defendant took this as a command and stated that Parker had a firm grip on his arm. Parker then walked defendant to Parker's squad car, opened the back door, and told defendant to get in. Parker then closed the door.

¶ 30    All of the windows in Parker's squad car were up. Defendant was alone in the back of the squad car for approximately 45 minutes before he spoke to anyone. At that time, Parker opened the back door and asked if defendant needed anything. Defendant asked if the pedestrian was okay, and Parker said he would let defendant know. Parker closed the door and defendant again sat alone in the squad car for another 15 to 20 minutes before speaking to anyone.

¶ 31    Schwartz then opened the back door to speak with defendant. Parker's squad car overhead lights were still flashing at that point. Schwartz asked defendant for the details of the incident. Defendant was seated in the back of the squad car for the entire conversation and no one else was present. After a short conversation, Schwartz told defendant to exit the car for a breath test. Schwartz told defendant that his BAC was 0.083. Schwartz then directed defendant to return to the back seat of the squad car and closed the door. Defendant waited in the squad car for another 15 minutes before talking to anyone else.

¶ 32    Hetfleisch opened the back seat door and spoke with defendant. Defendant said, "I am the asshole who hit that guy," after he introduced himself to Hetfleisch. While defendant was in Parker's squad car, defendant was not sure if the car was running or if the air conditioning was on. The siren was not on, but the exterior flashing lights were flashing. It was dark outside and the interior lights of the vehicle were not on, except when the door was opened. According to

9

defendant, it was summertime and the temperature was warm and humid. Defendant was wearing shorts and a T-shirt.

¶ 33    Defendant did not ask the officers if he could go home. None of the officers told defendant he was under arrest or said he was not free to leave. Each time that defendant spoke with an officer it was a one-on-one conversation.

¶ 34                                    E. Ruling on the Motion to Suppress

¶ 35    After hearing arguments on the motion to suppress, the court took the matter under advisement. The court then determined that the initial questions Parker asked defendant at the scene "were harmless up until the point that the Court finds that at the point that Deputy Parker began asking about the gravel on the tires, that at that point this changed from a[n] accident investigation to a criminal [i]nvestigation." The court found that once Parker did a pat-down search and placed defendant in the back seat of the squad car, a reasonable person would not believe they were free to leave and *Miranda* warnings should have been given. The court determined it was "going to suppress any statements given to Deputy Parker after the point at which the defendant was patted down."

¶ 36    The court clarified that "the statements regarding the change of story, I am going to allow it. Okay, those initial statements." The court further stated that it was going to allow the statement that defendant made to Hetfleisch that defendant was "the asshole who hit that guy" because it was an unsolicited statement. Any questioning regarding what happened from Schwartz and Hetfleisch was suppressed.

¶ 37    The State then asked the court about the State's request for a finding that the statements given to Hetfleisch and Schwartz were voluntarily made. The court's ruling is not entirely clear, but appears to conclude that any statements it was suppressing because defendant should have

10

received *Miranda* warnings were also involuntary statements. After the ruling on the motion to suppress, the State filed a certificate of impairment pursuant to Illinois Supreme Court Rule 604 (eff. July 1, 2017) and a notice of appeal.

¶ 38                                    II. ANALYSIS

¶ 39        The State argues that the trial court's order suppressing evidence should be reversed. In support of this contention, the State claims the deputies' questioning of defendant was general on-the-scene investigation. Further, the State argues defendant was not in custody during any of the questioning, such that *Miranda* warnings were not necessary prior to questioning. The State further contends the court erred in determining that the statements it suppressed were involuntary.

¶ 40        On appeal, defendant argues the statements were properly suppressed because defendant was in custody for purposes of *Miranda* warnings. Defendant concedes the trial court erred in finding the statements involuntary.

¶ 41                                    A. *Miranda*

¶ 42        We review the circuit court's suppression ruling under a bifurcated standard. *People v. Oliver*, 236 Ill. 2d 448, 454 (2010). The court's factual findings will only be reversed if they are against the manifest weight of the evidence. *Id.* We review the court's legal determination of whether suppression is warranted *de novo*. *Id.*

¶ 43        Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his

11

freedom of action in any significant way." *Id.* With regards to the procedural safeguards, before "any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

¶ 44      At the outset, the circuit court did not suppress the statement by defendant that he was "the asshole who hit that guy" after finding this comment was an "unsolicited statement" and defendant's inquiries into how the pedestrian was doing were "voluntary" and thus were not suppressed.[2] See *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."). These spontaneous statements by defendant are not at issue for purposes of this appeal.

¶ 45      Turning to the remaining statements by defendant, the parties do not dispute that defendant was not provided *Miranda* warnings. The parties do not dispute that defendant was interrogated. Hence, our focus is limited to the issue of whether defendant was in custody. The case law provides that "[t]he determination of whether a defendant is 'in custody' for *Miranda* purposes involves '[t]wo discrete inquiries ***: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The following factors have been found relevant to a determination of whether a defendant is in custody:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of

---

[2]Based on our review of the transcript containing the court's suppression ruling, we interpret the court's use of "unsolicited" and "voluntary" to describe a spontaneous statement.

family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008).

"[P]ersons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for purposes of *Miranda*" but "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

¶ 46        Based on this record, we conclude defendant was not in custody when he was initially questioned by Parker, or while he was standing in close proximity to his own vehicle. The conversation consisted of very general on-the-scene questioning of brief duration, which lasted approximately 15 minutes. During this time, there were no indicia of formal arrest or restraints on defendant's freedom as defendant spoke to Parker one-on-one. At that time, the situation was akin to a temporary detention pursuant to a traffic stop, which would not rise to the level of a custodial situation. See *id.*

¶ 47        However, after Parker searched defendant, removed and retained defendant's cell phone and keys, placed defendant in the back seat of the squad car, and then shut the door, the encounter became custodial. Without access to his keys or cell phone, defendant could not drive away and lacked the ability to call another person for assistance or to make arrangements for a ride. When Schwartz and Hetfleisch separately questioned defendant, each stood in or near the back doorway to the squad car. Defendant was not allowed to exit the squad car during these

13

conversations and remained seated in the back seat. Defendant was effectively locked inside the squad car, *incommunicado*, for approximately 70 to 75 minutes. A reasonable person in defendant's position would not have felt at liberty to terminate the encounter and leave the scene.

¶ 48    At this juncture, it is not necessary to explicitly address the other factors outlined in *Slater*, except to state that we have considered those other factors before reaching the decision to affirm the trial court's ruling.

¶ 49                                  B. Voluntariness

¶ 50    After the trial court granted defendant's motion to suppress, the State asked the trial court to clarify whether the suppressed statements would be admissible for impeachment purposes. The trial court informed the prosecutor that the incriminating statements would not be admissible for any purpose due to their involuntary nature. The State challenges this ruling on appeal.

¶ 51    Both the State and defendant agree this ruling was erroneous as a matter of law. We agree. It is well settled that any statements obtained in violation of *Miranda* may later be used during the trial for impeachment purposes, despite being unavailable to the State during its case-in-chief. *People v. Jackson*, 180 Ill. App. 3d 78, 89 (citing *Harris v. New York*, 401 U.S. 222 (1971)); see also *People v. Rosenberg*, 213 Ill.2d 69, 80-81 (2004).

¶ 52    Significantly, defendant did *not* argue his statements were coerced or involuntary for purposes of his motion to suppress. Instead, defendant's motion to suppress focused on a single theory related to the *Miranda* violation.

¶ 53    As defendant notes in his brief on appeal, "These are distinct bases for suppression of a statement, and so to the extent the trial court implied that the statements should *also* be suppressed because they were involuntary, that is error. That error does not, of course, impact the *Miranda* analysis, which is a separate issue entirely." We could not have said it better. Thus, we

14

accept defendant's concession of error. Accordingly, we reverse the circuit court's determination that the suppressed statements were involuntary but affirm the trial court's order granting defendant's motion to suppress based on a *Miranda* analysis. The matter is remanded for further proceedings.

¶ 54                                   III. CONCLUSION

¶ 55        The judgment of the circuit court of Will County is affirmed in part, reversed in part and remanded.

¶ 56        Affirmed in part, reversed in part, and remanded.