NOTICE
Decision filed 10/24/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220329-U

NO. 5-22-0329

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MI'KAYLA H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 21-JA-71 |
| | ) | |
| v. | ) | |
| | ) | |
| Michael H., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's order finding the minor child neglected was not against the manifest weight of the evidence. The circuit court's finding that the Indian Child Welfare Act did not apply is affirmed where the evidence fails to support a finding that the minor child was an "Indian child." The court did not violate father's right to counsel where father refused appointment of an attorney without good cause.

¶ 2    The respondent father, Michael H., appeals the Champaign County circuit court's order finding Mi'Kayla H. was neglected. On appeal, Michael also argues that the circuit court did not have jurisdiction pursuant to the Indian Child Welfare Act (25 U.S.C. § 1901 *et seq.* (2018)) because notice was not provided to the Potawatomi tribe. He further argues that the circuit court

1

erred by refusing his request for alternative appointed counsel. For the following reasons, we affirm.

¶ 3                               I. BACKGROUND

¶ 4     Michael H. is the putative father of Mi'Kayla H., born January 14, 2020. Mi'Kayla's biological mother, Danesha, is not a party to this appeal and will only be discussed as necessary to provide relevant background for the issues presented.

¶ 5     On September 27, 2021, Mi'Kayla was burned on her face and upper arms when an iron fell on her. Danesha and Michael took Mi'Kayla to Lurie Children's Hospital of Chicago (Lurie) for treatment. The Lurie medical records stated that Michael "made delivery of care difficult for [the] entire team," was "not cooperative with request of team treating patient," and was "[v]erbally disruptive of the entire unit." The records indicated that Michael interfered with the medical providers' treatment of the child by refusing to allow certain treatment and refusing to consent to Mi'Kayla's transfer to the burn center at Loyola University Medical Center (Loyola). After "[s]ocial services and security [were] asked to assist in order to ensure [a] safe environment to provide care," Michael's "disruptive behavior escalated." "Police [were] called and [Michael was] escorted out" of the emergency department. Danesha remained at the hospital and consented to Lurie's recommendation to transfer Mi'Kayla to Loyola for further burn care. The Lurie records further indicated that the family lived in Champaign, Illinois, and were visiting Chicago.

¶ 6     On October 4, 2021, the State filed a three-count petition for adjudication of abuse, neglect, or dependency pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)), alleging that Mi'Kayla's environment was injurious to her health because (1) the child was exposed to domestic violence, (2) the child was exposed to the effects of Michael's mental illness, and (3) the child was exposed to Michael's erratic behavior. The petition

2

was supported by a shelter care report prepared by the Illinois Department of Children and Family Services (DCFS).

¶ 7    The shelter care report addressed Michael's behavior at the hospital and indicated that the underlying reason for Michael's displeasure at the hospital was his belief that his privacy rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code (2016))) were being violated. The report further noted that following Mi'Kayla's transfer to Loyola, Michael asked why Champaign DCFS was involved and advised the agency that the family moved to Chicago six months earlier. In order to determine the child's residence, DCFS attempted to contact Danesha. Michael answered the telephone call and denied DCFS's request to take the telephone off speaker. In response to DCFS's question regarding residence, Danesha stated they no longer lived in Champaign, but she had not yet changed her address. She stated they moved to Chicago two months earlier.

¶ 8    The report further stated that Michael called the agency an hour later and again advised the agency that they lived in Chicago. Thereafter, Michael asked numerous questions about HIPAA and whether his lawyer in Champaign took "these kinds of cases." After advising Michael that they could not answer those questions, Michael demanded that all further communication occur through email. Michael was advised that his request limiting communication to email was contrary to DCFS policy. Michael continued to complain that his HIPAA rights were violated by the hospital and was advised he would have to talk to someone at the hospital regarding that issue.

¶ 9    The report indicated that the Champaign County DCFS office then enlisted assistance from Cook County DCFS to determine whether Mi'Kayla's actual residence was in Champaign County or Cook County. Thereafter, DCFS received a call from the social worker at Loyola's burn unit

3

reporting that the physician "wanted a full work up" and "the parent" was "denying blood work and a skeletal exam." The social worker further reported that Michael's behavior had been aggressive, and he was not allowed back in the hospital. When Champaign County DCFS attempted to obtain Danesha's apartment number in Champaign, to determine residency, Michael would not provide it. When Michael was asked for Danesha's cell phone number, Michael provided a nonworking number. Champaign County DCFS eventually received Danesha's correct telephone number and the apartment number in Champaign from Danesha during a three-way call with Michael. After completing the call, Champaign County DCFS went to the address of the Champaign residence and left an agency card at the door.

¶ 10    Upon return from the alleged Champaign address, DCFS called Danesha on her personal cell phone. At that time, Danesha admitted lying to the agency about her residence and stated she had done so because Michael told her DCFS would take the baby if she did not say what he told her to say. Thereafter, Champaign County DCFS took control of the case. Danesha confirmed that she consented to Mi'Kayla's skeletal x-ray and blood work, both were performed, and she was awaiting the results. Danesha stated that she and Mi'Kayla lived in Champaign, and only they lived at the residence. As to Michael, Danesha stated that she wanted him to stop telling stories because she needed him by her side during this time. She further confirmed that Michael had been kicked out of both hospitals due to his behavior and lying.

¶ 11    The DCFS shelter care report also indicated that two hours after speaking with Danesha, Michael left a telephone message, after calling seven times in the previous 22 minutes, stating:

"Hey how are you doing *** this is [Michael], ah, I am here at the home in Champaign Illinois ***, I just received your card in the door, ah, I'm here at the house if you want to come have the interview, that would be fine, you can get ah,

4

walk around the house, just checking everything, if you can, please give me a call back *** thank you."

¶ 12    The report further indicated that on September 30, 2021, the agency was informed that the minor was ready for discharge and the agency advised the hospital social worker that it would be taking protective custody of the minor. After securing placement, DCFS called Michael and advised him of the shelter care hearing. Michael stated he would not be there. When DCFS stated that it wanted to meet with him so he could sign the notice, Michael stated he was "not signing anything" and further stated he was "not on the birth certificate and *** [did] not have to be there." When DCFS advised Michael that he previously stated he was on the birth certificate and was the father, Michael again stated he was not on the birth certificate. Michael then raised numerous legal issues and was told the agency did not give legal advice. The report indicated that the agency also informed Michael that his 31 calls to the agency that day were very disruptive and to simply call and leave a message. The shelter care report concluded by recommending the court find that immediate and urgent necessity, exigent circumstances, and probable cause existed. The report further recommended the court find it was in the child's best interest to be temporarily placed with DCFS, order supervised visitation between Danesha and the child, and suspend visitation between Michael and the child.

¶ 13    The shelter care hearing was held on October 4, 2021. Danesha appeared and counsel was appointed. Michael did not appear. The State provided a factual basis that addressed Michael's behavior at Lurie hospital and further stated the family had a history of domestic violence. The State indicated that Michael's mental health was brought into issue in a 2018 traffic case, but noted the case was dismissed, and the file destroyed. The guardian *ad litem* and Danesha stipulated to probable cause. Thereafter, the court found probable cause on counts I (domestic abuse) and III

5

(Michael's alleged erratic behavior) but denied count II (Michael's alleged mental illness). By agreement of the parties, temporary custody was to remain with Danesha; however, the court found that immediate and urgent necessity required temporary removal of Michael's custody and supervised visitation by an agency employee or a DCFS-approved party.

¶ 14    The adjudicatory hearing ultimately occurred over the course of six days. The first day of the hearing was held on December 28, 2021. Michael appeared and eventually agreed that he understood what was being claimed in the petition. After being advised of his right to counsel, Michael stated that he wanted to represent himself on five different occasions. As the court began the admonitions for a waiver of counsel, Michael interrupted and asked, "So, what *** if the baby's Native American?" The court stated it could not answer that question, but a lawyer could and further explained how a lawyer might assist him in this matter. Michael stated that he would take an attorney and requested the court appoint counsel.

¶ 15    The court appointed Brittany McKnight. Upon hearing the name of his appointed counsel, Michael immediately stated that he wanted to represent himself, claiming that Ms. McKnight was the reason everyone thought he was mentally ill, and that she tried to force him to admit he had a mental illness in a different case. The court asked Michael if he still wished to give up the right to an attorney and represent himself. Michael responded, "I'll take another attorney, but not her." The court replied, "Doesn't work that way. You don't get to shop around for other attorneys. She is the attorney that's assigned to this case." Michael again stated that he did not want Ms. McKnight to represent him. When the court asked Michael if he wanted to represent himself or have Ms. McKnight appointed, Michael stated, "I'll just hire an attorney." Thereafter, the court continued the case to allow Michael to obtain counsel.

¶ 16    The second day of the adjudicatory hearing was held on January 3, 2022. Prior to the hearing, Michael contacted the court and stated he tested positive for COVID. Arrangements were made to allow Michael to participate at the hearing by telephone. The court attempted to contact Michael via the two telephone numbers he provided. The first number went to voicemail and the second was answered by a man who stated he was Michael's brother and Michael was not there. The court reset the matter for February 7, 2022.

¶ 17    The third day of the adjudicatory hearing was held on February 7, 2022. At that time, the court again advised Michael of his right to counsel. Michael continued to state he did not want Ms. McKnight as his attorney and that when Ms. McKnight represented him in a different matter, she told him that he would have all-white jury if he chose to proceed with a trial. The court explained that there were only two available attorneys in the public defender's office, and one was already taken by Danesha. The court stated Michael had the right to appointed counsel, but not the right to have a list of attorneys provided so he could pick one. When the court asked Michael if he wanted to represent himself, he said no, he wanted a lawyer. When the court stated that the appointed lawyer would be Ms. McKnight, Michael stated that he did not want a lawyer and would just represent himself. Following a lengthy discussion regarding the procedural process of the case at bar, Michael stated he was ready to proceed.

¶ 18    The State called DCFS investigator, Catherine McGlone. She confirmed the events listed in the shelter care report by testifying about the hotline report from the Chicago hospital, Michael's behavior at the hospital, Michael's statements about living in Chicago, the numerous telephone calls Michael made to the agency requesting legal advice, and Danesha's statement that Michael forced her to lie about the location of her residence. Ms. McGlone further testified that Michael repeatedly stated that Mi'Kayla was not his child.

7

¶ 19    The State called Danesha who testified about Mi'Kayla's accident as well as Michael's behavior at the hospital. She stated that she lied about her address because Michael told her to lie. She agreed to lie because she thought it would make the DCFS process move more quickly. Danesha denied any incidents of domestic violence but admitted calling the police on Michael in 2018 because "it was a lot going on." When asked what was going on, Danesha stated she did not recall. When asked if she was scared of Michael when she made the call to the police, Danesha replied, "It was a lot going on." Following Danesha's testimony, the State submitted medical records from Lurie and Loyola. Michael objected claiming the records were not the right thing to present as evidence. Although the basis of the objection was unclear, due to the objection, the court requested to see the certifications. Only the Lurie certification was found, and those records were admitted. The State requested a continuance to obtain the certification from Loyola, but the request was denied.

¶ 20    The State then called Michael to testify, at which time he stated that he was homeless and living on the street. He did not recall and did not know if he was Mi'Kayla's father. Michael disputed the events at both Chicago hospitals, including his removal from the facilities. He also stated that he remained in a relationship with Danesha.

¶ 21    The court acknowledged that Michael could not cross-examine himself and therefore allowed Michael to provide his own testimony regarding the events. Michael stated he was Muslim and that was why he did not consent to the treatment. He further stated that he did not want all the people in Mi'Kayla's room because they were students. He indicated that he would not sign the consent for Mi'Kayla to have an IV because the paper stated they were treating Mi'Kayla, and he disputed that the hospital had actually treated Mi'Kayla. He was told that the Lurie personnel could not do their job if he did not sign the paper. He felt like he was being pressured to sign the paper.

He stated that they tried to separate him from Danesha to try to break them up so she would sign the paper, but Danesha wanted him there because she did not understand what was happening. He also testified that the Lurie hospital personnel were rude and told them they could not leave so he felt like he was in prison. All he wanted to do was leave and take the baby. He further testified that the personnel at Loyola hospital completely agreed with him and stated he did not need to sign documents for the hospital to do their job. He stated it was not medical neglect because the basis for his refusal of treatment was his religion. Thereafter, the State rested. The guardian *ad litem* and Danesha's counsel rested without the presentation of additional evidence.

¶ 22    When Michael was asked if he wished to present witnesses, Michael stated that he wanted to call himself. Due to time constraints, the court stated the matter would need to be continued. Michael asked if he could return "remotely," and when asked for the basis of the request, stated that "my household has COVID, the whole house." Michael further stated that he had an interview in New York to get his bar license as an excuse for the proposed hearing date of February 28 and stated he would be in New York until March 16, 2022. When the court suggested an earlier date in February, Michael requested a date at the beginning of March, which was the same period he previously stated he would be in New York. The matter was eventually set for March 7, 2022.

¶ 23    The fourth day of the adjudicatory hearing was held on March 7, 2022. After a lengthy discussion addressing a witness that may or may not have been served with a subpoena, Michael eventually called DCFS caseworker, Kevin Barnett, to testify. Mr. Barnett testified, *inter alia*, that Michael was offered services but declined them, Michael made numerous telephone calls to Mr. Barnett requesting answers to legal questions, Michael required supervised visitation, supervised visitation was offered to Michael but was declined, and Michael denied Mi'Kayla was his child. Following Mr. Barnett's testimony, Michael advised the court that he wanted to call Danesha as

9

his next witness, and a recess was taken. Upon return, it was determined that the hearing would need to be continued due to time constraints, and the case was reset for March 29, 2022.

¶ 24    On March 23, 2022, the State filed a supplemental petition for adjudication. The petition alleged Mi'Kayla was neglected because she was in an environment injurious to her welfare due to Michael's mental illness.

¶ 25    The fifth day of the adjudicatory hearing was held on March 29, 2022. Michael called Dr. Lawrence Jeckel to testify. However, prior to Dr. Jeckel testifying, the court addressed the State's supplemental petition and, after hearing the arguments, took the matter under advisement. Thereafter, Dr. Jeckel testified that he was a psychiatrist, a forensic psychiatrist, and a consultant to the courts in Champaign County. He stated that he examined Michael on September 18, 2019, related to Michael's fitness to stand trial in a different case. He explained the process for preparing his report and stated that Michael's counsel in the previous case requested the evaluation. Dr. Jeckel testified that he ultimately opined, in the unrelated case, that Michael had a personality disorder characterized by faulty thinking, was not fit to stand trial, and recommended Michael be evaluated either on an outpatient basis or in an inpatient psychiatric unit. Dr. Jeckel testified that it was his understanding that Michael's previous case was eventually dismissed and confirmed the court never issued a ruling on Michael's fitness.

¶ 26    On cross-examination by the State, Dr. Jeckel advised the court of his education and background, and the State tendered him as an expert witness in the areas of both psychiatry and forensic psychiatry. Only Michael objected; however, the basis of the objection was unclear, and the objection was overruled. Dr. Jeckel explained that a personality disorder was an "enduring pattern of inner experience and behavior that deviate[d] markedly from the average." This meant "that the person ha[d] defects in cognition[,] thinking[,] and affect and maybe impulse control and

10

interpersonal functioning." He stated the pattern was "inflexible and enduring." "Enduring" was the "key word" because those kinds of problems would bring conflict with occupations, legal proceedings, and social interactions. Dr. Jeckel believed that Michael had those inflexible and enduring patterns now. He agreed that Michael's obsession with his rights was a symptom of his personality disorder because Michael's "inordinate focus on grievance" was part of his personality disorder. He assumed that the diagnosis would also cause issues with DCFS.

¶ 27    Based on his 2019 examination, Dr. Jeckel opined that Michael's diagnosis would interfere with his ability to make sound decisions regarding Mi'Kayla's health care. He explained that Michael could not make logical connections that would enable him to have rational communication with another person. Dr. Jeckel opined that Michael's condition was unlikely to improve without treatment. Based on the physician's interactions with Michael in court earlier in the proceeding, he opined that Michael continued to show the same kind of faulty thinking seen in 2019. Following Dr. Jeckel's testimony, the case was continued to allow Michael to subpoena and present testimony from another physician. On April 1, 2022, the circuit court issued an order for genetic testing directed to Michael, Danesha, and Mi'Kayla.

¶ 28    The sixth and final day of the adjudicatory hearing was held on April 19, 2022. Michael called Arnold Black, the DCFS supervisor of investigators. Mr. Black testified about how the case came to DCFS and the agency's intent to investigate Michael's actions at the hospital. Following Mr. Black's testimony, Michael wanted to re-call Catherine McGlone but ultimately did not. He further advised the court that he was unable to present his proposed physician witness testimony and rested his case.

¶ 29    Following the close of evidence, the circuit court allowed the State's supplemental petition alleging that Mi'Kayla was neglected because she was in an injurious environment due to

11

Michael's mental illness. The parties presented closing argument and thereafter, the circuit court found the State failed to prove count I (domestic abuse) but proved count III of the original petition (erratic behavior) and count I of the supplemental petition (mental illness) to find Mi'Kayla neglected. In support, the court found that Michael had disorganized thinking and focused on all the wrong things based on Dr. Jeckel's testimony as well as Michael's presentation in court. The court ordered DCFS to prepare an investigation and report detailing the mental and physical history of the child, the family situation, and other relevant information deemed appropriate. The court further ordered the parties to cooperate with the preparation of the report, which included interviews and signing authorizations to release information. Michael interrupted stating, "I don't sign anything." The court stated that whatever Michael wanted to use as a substitute for his signature would be sufficient.

¶ 30     After agreeing to do so, Michael asked, "[S]o what about if you're Native American? What, what about in that situation? Can you go to the—to the people at the Native American, at the place?" After asking for clarification of Michael's question, the court asked Michael if he thought Mi'Kayla had Native American ancestry, and Michael said yes. When asked which tribe, Michael replied, "Potawatomi." When asked the basis of his belief, Michael responded, "History." After a request for additional information, Michael stated, "I think my granddad—my great granddad was Potawatomi." Michael confirmed that he was not a registered member of the Potawatomi tribe. He said he "did not know" if Danesha was a registered member of the tribe. Danesha's counsel was asked if Danesha believed Mi'Kayla had Native American ancestry, and he stated, "No, Your Honor, at least she has no reason to *** believe it."

¶ 31     While the court was addressing the import of the Indian Child Welfare Act, Michael interrupted and stated, "I know my granddad *** is for sure." Michael stated his grandfather's

name was Abe and confirmed Abe was still alive and living in China. He did not know what town and knew of no way to contact Abe. When asked if he believed anybody else in his family had Native American ancestry, Michael replied, "Well, my whole granddad's side of the family, if I'm not mistaken." Michael admitted he had no contact with any other members of his grandfather's family but believed they lived in Richfield, Utah. Michael stated he last spoke to Abe on the phone six months earlier but did not have Abe's phone number because Abe called him collect. Michael volunteered to see if he could find out more information from his mother. Michael provided his mother's name and address to the court and stated he did not know her telephone number. The court directed Michael to answer DCFS's questions regarding his heritage.

¶ 32　　Thereafter, the circuit court stated it would issue a written decision for the adjudicatory hearing and set the matter for a dispositional hearing on May 17, 2022. Once the court set the date, Michael brought up the issue of his parentage and questioned the State's allegation that he was Mi'Kayla's father. Thereafter, the court asked Michael if he wanted to reconsider appointment of an attorney, stating he had the right to be represented by an attorney and the attorney that would be appointed was Ms. McKnight. After declining Ms. McKnight's representation four times, Michael was asked, "Would you like me to appoint Ms. McKnight to represent you or not?" Michael stated, "Yes, I'll take Ms. McKnight." The court appointed Ms. McKnight and immediately thereafter, Michael stated, "No, no, no. I won't *** take Ms. McKnight. *** I'm going to save that headache." Thereafter, the court rescinded the appointment and recessed the court.

¶ 33　　The circuit court's written order found that Mi'Kayla was abused or neglected as defined by section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)) in that the minor was in an environment

13

that was injurious to the minor's welfare as defined by section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). The court's hand-written support for the findings stated:

"Respondent father Michael *** exhibits defective thinking that obsessively distracts his focus to unimportant personal grievances, and this obstructs his ability to manage any crisis situation for the minor. On September 27, 2021, this defective thinking[,] and the erratic behavior it causes[,] resulted in [Michael] obstructing and delaying emergency medical care for the minor to treat serious burns. Ultimately, he had to be forcibly removed from the hospital so the minor could obtain the treatment *** and the transfer to a burn unit that she needed. [Michael's] obstruction of necessary care was not based on an assertion of religious belief, but instead was based on an irrational fixation of perceived violation of protocol (his claim that too many people were in the room) and HIPAA.

Respondent mother [Danesha] cannot safely manage [Michael's] defective thinking. Her inability to step in when the minor's health and welfare were one reason why [Michael] was forcibly removed from the hospital, and later, when DCFS became involved, his influence caused her to lie to the investigator initially.

Also, [Michael's] defective thinking was not a one-time aberration. It is a chronic problem that was on display through his later interactions with the DCFS investigator (for example, when he kept asking about HIPAA and legal issues instead of focusing on his child). [Michael] testified that he is homeless and living on the street which is consistent with life problems that his defective thinking

14

naturally would cause. Also, DCFS entered an indicated finding for [Michael] interfering with emergency treatment for the minor.

Finally, [Michael] called as a witness, Dr. Lawrence Jeckel, a well-qualified forensic psychiatrist who examined [Michael] in relation to an earlier unrelated case. Dr. Jeckel observed defective thinking exactly like what [Michael] exhibited during the events on September 27 and after. While Dr. Jeckel's testimony was essential for a diagnosis, namely Personality Disorder, and the State's proof of Count I of the Supplemental Petition filed on 3/23/22, Count 3 of the original Petition filed on 10/04/21 was proved even without his testimony."

¶ 34 On May 11, 2022, DCFS filed an emergency motion for court order. The motion alleged that the assigned caseworker participated in an integrated assessment interview with Michael on April 22, 2022, but Michael called the caseworker seven days later and canceled his consent to use his information in the DCFS report. On May 12, 2022, DCFS filed its dispositional report without information from Michael's integrated assessment interview.

¶ 35 The dispositional hearing was held on May 17, 2022. However, the court first addressed DCFS's emergency motion. In response to DCFS's argument, Michael stated that he never talked to the people at DCFS, DCFS would not answer the phone, and when DCFS called him they were laughing and told him to stop calling. When he did reach the caseworker, the caseworker stated he could not talk because he was driving. Michael advised that he never told DCFS that he was withdrawing his consent because he never gave them consent in the first place. He later confirmed that he told DCFS that he did not give them consent to use his public information, more specifically, the information they had on file. When counsel for DCFS provided additional facts related to her motion, including that caseworker Kevin Barnett spoke with Michael on April 22,

15

2022, Michael vehemently denied talking to Mr. Barnett and stated that Mr. Barnett never even picked up the phone when he called for his interview. He later stated Mr. Barnett said he was driving and could not do the interview.

¶ 36    The circuit court found the issue moot and immediately thereafter, Michael requested a continuance stating there was not enough information to proceed. The court asked Michael if he would provide consent to allow DCFS to obtain the information, and he said no. The court denied Michael's motion to continue and directed DCFS to provide copies of the information it obtained regarding Michael to the parties and recessed the court proceeding to allow the parties to review the report.

¶ 37    After going back on the record, the court asked the parties if they had an opportunity to review the report. All the parties answered affirmatively, except Michael who stated that he started to read it but got upset and then just turned it back around. When the court asked if he had the opportunity to read the document, Michael said, "No, sir." The court then asked what opportunity Michael needed and Michael stated, "I can't read." When asked how Michael wanted to proceed, he responded, "I think the court should proceed. Let's hear what's going on. Let the court proceed, go through the dispositional." As an accommodation to Michael's alleged reading difficulty, the court ultimately decided to disregard the dispositional report filed on May 12, 2022, stating live testimony would be used as the basis of the hearing.

¶ 38    The State called DCFS caseworker, Kevin Barnett. As to the issues in this appeal, Mr. Barnett stated that he spoke with Michael via telephone for over an hour on April 22, 2022, during which time he performed the integrated assessment interview. Michael advised Mr. Barnett that he had a high school diploma and some college education. Michael reported that he was currently

homeless; however, Mr. Barnett believed that Michael lived with his mother in Chicago. Michael also provided his work history.

¶ 39    Mr. Barnett stated that Michael denied having any kind of mental health diagnosis or being on any psychotropic medication. Michael told him that his mental health only came into question when Ms. McKnight was representing him in a different case. Michael also told Mr. Barnett that he was Muslim and Native American. Mr. Barnett stated that numerous services were recommended for Michael including participation in a mental health assessment with follow up recommendations, participation in a psychological and parenting capacity assessment with follow up recommendations, parenting classes, and visitation. Mr. Barnett stated he was unable to make the referrals for services because Michael declined all services. Mr. Barnett also confirmed that Michael never had visitation with Mi'Kayla. The agency asked Michael to identify a third-party person so a background check could be performed prior to any visitation but no person was provided. The agency also asked Danesha's family if they were willing to supervise visitation between Michael and Mi'Kayla and they declined. So far, no willing third-party had been found.

¶ 40    Mr. Barnett testified that Michael went back and forth on the issue of whether or not he was actually Mi'Kayla's father. DNA testing was scheduled for Danesha, Michael, and Mi'Kayla on May 31, 2022. Mr. Barnett confirmed that Michael presented at the DCFS office multiple times and was escorted from the building by security on March 7, 2022, when Michael became heated, argumentative and would not deescalate.

¶ 41    Mr. Barnett testified that Michael called the DCFS office 25 times on March 2, 2022, 13 times on March 16, 2022, 12 times on March 30, 2022, 7 times on April 8, 2022, and 20 times on April 22, 2022. Mr. Barnett confirmed there were also other dates in which Michael called the DCFS office between 18 and 25 times in one day. Thereafter, Mr. Barnett set up a specific time at

17

1:30 p.m. on Thursdays for Michael to call. He said this was not normal, but the repeated calls were tying up DCFS resources. He confirmed that Michael did utilize the allotted time period but also continued to call during other periods. Mr. Barnett classified Michael's behavior as erratic and bizarre, and stated Michael's behavior was depleting the agency's resources.

¶ 42   Mr. Barnett testified that when he spoke with Michael about the psychological and parenting capacity exam, Michael made it clear that he would not sign the paperwork necessary to make that referral. Pursuant to the court's directive, the agency only asked Michael to sign with an "x", but he declined to do so and said he did not want the service.

¶ 43   Mr. Barnett confirmed that he performed a Law Enforcement Automated Data System (LEADS) check on Michael and the results revealed that Michael had three convictions for dangerous drugs. Mr. Barnett requested Michael participate in a substance abuse assessment, but Michael declined. Mr. Barnett stated that Michael informed him that he was part of the Potawatomi tribe, but that Michael provided no other details regarding his connection to the tribe. With regard to Michael's scheduled genetic testing, Mr. Barnett stated that Michael did not agree to the testing, but the appointment was scheduled anyway.

¶ 44   The court asked Mr. Barnett if DCFS made any attempt to contact the Potawatomi tribe and Mr. Barnett responded:

> "So[,] I tried to work with [Michael] to get information related to his lineage. ***
> I need his parents' names and their Social Security numbers, and the grandparents'
> names and Social Security numbers so I can fill out the ICWA form to submit to
> that office and the Department."

Mr. Barnett further advised that he was "unable to gather the information needed to submit that inquiry." The court asked what he meant by "unable," and Mr. Barnett responded, "I can submit a

form, but it's going to be incomplete, because I don't have an in-depth history of [Michael's] family." When asked why he did not have the information, Mr. Barnett replied, "Because [Michael] will not provide it to me." Michael then interrupted and stated, "I have provided it."

¶ 45 The court asked Mr. Barnett if he could make a meaningful request through DCFS to find out from the Potawatomi tribe if there was genuine Native American ancestry without the information. Mr. Barnett responded, "I don't know, Judge. I don't know how meaningful it will be without the form being complete with family lineage." When Mr. Barnett was asked if he thought he had enough to make a meaningful request to DCFS, Mr. Barnett stated, "I can submit one and see what they say." The court stated, "Well, that's not the question. The question is, do you have enough information, based on your knowledge about how that process works through DCFS to make a request likely to discover if there is an actual connection to the Potawatomi tribe?" Mr. Barnett responded, "Based off the information I have, just his identification of Potawatomi, I don't believe that's enough to have a *** meaningful inquiry."

¶ 46 Mr. Barnett confirmed the genetic testing was scheduled for May 31, 2022, and again confirmed that Michael stated he would not participate. The court asked if there was any established legal paternity of Mi'Kayla by Michael, and Mr. Barnett stated, "To my knowledge I don't have any, no."

¶ 47 During cross-examination, Michael asked Mr. Barnett if Native Americans had Social Security numbers and Mr. Barnett stated he did not know. Michael also asked what information Mr. Barnett needed for the Native American inquiry. Mr. Barnett stated, "So on the ICWA form I fill out and sen[d] *** to the office and the Department[,] [i]t asks for your name, date of birth, address, who your mother is, who your father is, who your grandparents are, their names, dates of births, social security numbers, their addresses." Mr. Barnett also confirmed that the agency did

19

not have a copy of Mi'Kayla's birth certificate. In later inquiry, Mr. Barnett confirmed that Michael refused to disclose the names and addresses of either of his parents.

¶ 48    Following Mr. Barnett's testimony, the State asked the court to take judicial notice of all prior orders in the case as well as Dr. Jeckel's testimony at the prior hearing and rested. The guardian *ad litem* and Danesha's counsel declined the opportunity to present evidence.

¶ 49    Michael called Danesha to testify. The majority of these inquiries, including those by the court, were whether Danesha believed Michael to have a mental illness and whether she believed Mi'Kayla would be safe with Michael. The responses were equivocal and depended on whether Michael, the court, or other counsel asked the question. Following Danesha's testimony and closing arguments by the parties, which included Michael stating he would "never take the DNA test," the court found, limited solely to the issues presented in this appeal, the following:

> "First of all[,] the decision as to whether it's in the interests of Mi'Kayla and the public that Mi'Kayla be made ward of the court, I think clearly it is. There's an issue here, and issue [is] related to [Michael], who suffers from mental health issues ***.
>
>     ***
>
> Michael *** always vacillates between saying he's Mi'Kayla's father, saying he's not her father. We all know he's not going to cooperate with genetic testing, no matter what the court orders and *** I don't know that he's ever going to cooperate with answering that question. And we may make it all the way through to the end of this case without any establishment of legal paternity."

Michael then interrupted and stated, "Yeah, I'm not doing that."

¶ 50    The court continued:

20

"Now before I get to any further findings, let me talk about record, okay? I want to make the record clear about some issues that have happened through this case. One, ICWA, the Indian Child Welfare Act. The testimony and the evidence that the court has, and considering the evidence at adjudicatory hearing, too, is there has never been sufficient information provided by [Michael] so that a meaningful search could be done to find out if there is any connection between Mi'Kayla and the Potawatomi or any other tribe, such that the requirements of ICWA would be triggered. And there hasn't been sufficient information provided by [Michael] about his family such that DCFS could meaningfully get that question answered through the tribe or some other third party. They *** cannot discover that information, because [Michael] actively obstructs the process. So[,] there's been nothing but vague assertions that Mi'Kayla may have Native American ancestry. And while [Michael] has identified a tribe, Potawatomi, that's not enough for DCFS to do a meaningful request to answer the question, and he's not going to *** provide them with information that they could use to try and get that question answered. It just can't be done.

So based on what the Department had, based on what's been before the court, the requirements of ICWA have never been triggered. ***

Second, [Michael] representing himself. [Michael] has serious mental health issues. *** The problem was [Michael], because of his mental health issues, just was not able to cooperate in a meaningful way with his attorney. That is not a problem that I can address in a juvenile abuse and neglect case. So [Michael] has the right to counsel. He was never willing to accept that counsel. The reason he

21

gave was because Ms. McKnight would have been that counsel, but he was never able to present a *** reason why Ms. McKnight could not effectively represent him.

His argument was that she believed and filed a motion within a traffic case in Champaign County that he was unfit to stand trial, and so she wanted to have him examined. But there was never a finding of bona fide doubt. The court in that case never found that he was actually unfit to stand trial[;] all that happened is he received an examination from Dr. Jeckel, Dr. Jeckel formed an opinion, Dr. Jeckel testified about that opinion in this courtroom ***. But that report was obtained from Dr. Jeckel and then Ms. McKnight was successful in getting that traffic case dismissed with no finding of unfitness, no finding of guilt, nothing.

It looked like a stellar performance by a defense attorney. There was never a reason presented why the court could say that Ms. McKnight could not effectively represent [Michael], except that there was a problem in [Michael] trusting Ms. McKnight and cooperating with Ms. McKnight in that relationship *** going forward. But because of those mental health issues there was nothing that the court had that would make me think that the situation would be different with any other lawyer in the universe.

*** I was not willing to offer [Michael] a list of attorneys for him to choose from. That is not going to happen *** I'll say for the record now, Ms. McKnight, as of last week, left the public defendant's office. And so[,] in just a moment after I get through my order I'm going to offer [Michael] to appoint counsel to represent him against moving forward in this case. ***

I did not offer that opportunity to [Michael] at the beginning of this hearing or at any other point in this hearing, and I'll say *** for the record why.

First of all, again I have no reason to believe that his relationship with another lawyer's going to be any better. Second, if *** I appointed a different attorney to represent him now, all that was going to do was delay the dispositional hearing even further, and I'm not willing to do that. *** [T]his case has been pending for a long, long time, much of the delay created by [Michael] himself, who kept asking for additional opportunities to present evidence that he then didn't produce."

Thereafter, the court found it was in the best interest of the minor child and public to remove guardianship from both parents, ordered custody to remain with Danesha, and removed custody from Michael. It also suspended Michael's visitation until paternity was established, issued a protective order for Danesha against Michael, and ordered both parents to complete psychological evaluations and participate in genetic testing. Michael timely appealed.

¶ 51                                    II. ANALYSIS

¶ 52    On appeal, Michael argues that the circuit court lacked jurisdiction to enter its orders because it failed to comply with the notice requirement of the Indian Child Welfare Act. Michael further argues that the circuit court abused its discretion by refusing to appoint him alternative counsel and the circuit court's finding of neglect was against the manifest weight of the evidence. The State disputes all of Michael's arguments.

¶ 53                              Indian Child Welfare Act

¶ 54    On appeal, Michael contends that the circuit court lacked jurisdiction to enter its orders because it failed to comply with the notice requirement found in the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 *et seq.* (2018)). Michael argues that the circuit court knew or had reason

23

to know that Mi'Kayla was an Indian child, and therefore, it was error for the circuit court to issue any orders prior to notifying the tribe pursuant to section 1912(a) (*id.* § 1912(a)). In response, the State agrees notice is required under the ICWA but argues there was insufficient evidence that the ICWA applied due to Michael's refusal to provide required information for the inquiry. As this issue involves both jurisdictional consideration and statutory interpretation, our review is *de novo*. *In re C.N.*, 196 Ill. 2d 181, 203 (2001); *In re N.L.*, 2014 IL App (3d) 140172, ¶ 31.

¶ 55    "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent." *Nowak v. City of County Club Hills*, 2011 IL 111838, ¶ 11. Intent is best determined by reviewing "the statutory language, given its plain and ordinary meaning." *Id*. "Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction." *Id*. Only if the language is ambiguous or unclear, will we look beyond the language to ascertain its meaning. *Id*.

¶ 56    "The ICWA was enacted by Congress in 1978 in response to the growing concern over the consequences to Indian children, families[,] and tribes of abusive welfare practices which separated large numbers of Indian children from their family and tribes ***." *In re C.N.*, 196 Ill. 2d at 203 (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)). In seeking to protect the rights of both Indian children and Indian tribes, the ICWA addressed jurisdiction for child custody proceedings and provided procedural safeguards related thereto. *Holyfield*, 490 U.S. at 36. Section 1911(a) provides exclusive jurisdiction in child custody proceedings to a tribe when the Indian children are either domiciled within the tribe's reservation or are wards of a tribal court. 25 U.S.C. § 1911(a) (2018). Section 1911(b) "creates concurrent but presumptively tribal jurisdiction" (*Holyfield*, 490 U.S. at 36) in the remaining cases, requiring a state court to transfer the proceedings to the tribal court upon petition by the tribe or a parent,

24

unless either a good cause objection is raised by either parent or the tribal court declines jurisdiction. 25 U.S.C. § 1911(b), (c) (2018); see also *In re C.N.*, 196 Ill. 2d at 203-04.

¶ 57    In order to protect the tribal rights, section 1912(a) provides a procedural safeguard requiring notice to the tribe. 25 U.S.C. § 1912(a). Specifically, section 1912(a) states:

> "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to prove the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary ***." *Id.*

¶ 58    An "Indian child" is defined by the ICWA as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4)(a), (b). Here, neither party contends that the language is ambiguous. Therefore, we ascribe the plain and ordinary meaning to the words contained in the statutory language at issue and consider that language in conjunction with the evidence of record, to determine whether the circuit court correctly found that the ICWA did not apply.

¶ 59    While ostensibly compelling arguments were presented by both sides, the arguments were contradicted by the statutes we are asked to construe. The State's argument, that Michael's failure to provide the requisite information is sufficient to find the ICWA does not apply, is contradicted by the statutory language providing an alternative method for providing notice when information is unavailable. See *id.* § 1912(a). The State's argument is further undermined by the principle that a parent's action, or inaction, cannot waive the tribe's statutory right to receive notice of the proceedings and intervene when appropriate. See *In re N.L.*, 2014 IL App (3d) 140172, ¶ 33 (citing *Holyfield*, 490 U.S. at 49; *In re J.O.*, 170 P.3d 840, 842 (Colo. App. 2007)).

¶ 60    Michael's argument that the court "knew or had reason to know" that Mi'Kayla was an Indian child thereby triggering the statutory notice requirement is equally flawed. At first blush, it would appear Mi'Kayla falls within the definition of "Indian child"; however, upon review of this record in conjunction with the ICWA definitions, the argument fails. The statute provides two possible avenues to meet the definition of an Indian child: the child must either be "(a) a member of an Indian tribe or (b) *** eligible for membership in an Indian tribe and be the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4)(a), (b).

¶ 61    Here, the record is devoid of any evidence that Mi'Kayla is a member of the Potowatomi tribe. As such, the first avenue is unavailable. The second avenue initially holds promise as the record is equally devoid of any evidence that would preclude Mi'Kayla's eligibility for Indian tribe membership; however, the second avenue embraces additional requirements. " 'As a general rule, the use of the conjunctive, as in the word "and," indicates that the legislature intended for *all* of the listed requirements to be met.' " (Emphasis in original.) *Soh v. Target Marketing Systems, Inc.*, 353 Ill. App. 3d 126, 131 (2004) (quoting *Gilchrist v. Human Rights Comm'n*, 312 Ill. App. 3d

26

597, 602 (2000)). Here, in addition to being eligible for membership in the Indian tribe, the child must also "be the biological child of a member of an Indian tribe."

¶ 62    It is this second requirement that ultimately dooms Michael's argument. First, the record contains no definitive evidence that Mi'Kayla is Michael's biological child. Instead, the record reveals Michael's continued denial of parentage as well as his adamant refusal to participate in genetic testing. The statutory definition of a "parent" under the ICWA specifically excludes an "unwed father where paternity has not been acknowledged or established." 25 U.S.C. § 1903(9). Here, given Michael's inconsistent claims of parentage and refusal to submit to genetic testing, the court would not know, or have reason to know, that Mi'Kayla was an Indian child.

¶ 63    Second, even if parentage was determined, the record reveals that Michael is not a member of the Potawatomi tribe. During the proceedings, Michael twice alluded to his alleged Indian heritage. The first time, the circuit court performed no inquiry as the issue was framed as a question seeking legal advice. The second time, on the final day of the adjudicatory hearing, the court performed a detailed inquiry that revealed Mi'Kayla's potential Native American ancestry was with the Potawatomi tribe based on Michael's paternal ancestry. Relevant to the issue herein, the court specifically asked Michael, "Are you a registered member of [the] Potowatomi tribe?" In response, Michael stated, "No." The import of Michael's admission cannot be overstated as the court's well-constructed record on this issue contains no evidence contradicting Michael's unequivocal response.

¶ 64    Based on this evidence, Mi'Kayla does not, and cannot, meet the statutory definition of an Indian child. Notice under the ICWA is required only where "the court knows or has reason to know that an Indian child is involved." *Id.* § 1912(a). As such, we find that the circuit court's

orders were in compliance with the ICWA and affirm the circuit court's finding that the ICWA is not applicable in this case.

¶ 65                                   Right to Counsel

¶ 66    Michael also contends that the circuit court erred by refusing to appoint him alternative counsel. The State disagrees, claiming Michael was offered appointed counsel, but Michael rejected the appointment and chose to proceed *pro se*. Upon review of the record, it appears that Michael's waiver of counsel, the court's appointment of counsel, and Michael's request for alternative counsel comprise the issue herein. We review all of these events with an abuse of discretion standard. *People v. Griffin*, 305 Ill. App. 3d 326, 329 (1999); *People v. Horton*, 251 Ill. App. 3d 580, 583-84 (1993); *People v. Howery*, 178 Ill. 2d 1, 49 (1997). An abuse of discretion is found where no reasonable person would take the view adopted by the circuit court. *In re Marriage of Carpenter*, 286 Ill. App. 3d 969, 973 (1997).

¶ 67    Michael's statutory right to counsel is undisputed. See 705 ILCS 405/1-5(1) (West 2020). On appeal, Michael contends that the court's denial of his request for alternative appointed counsel was an abuse of discretion and argues that he "had neither the desire nor the obligation to present" a reason to appoint alternative counsel. We disagree.

¶ 68    This state has long held that "[a] defendant is not entitled to court appointed counsel of his choice." *People v. Carter*, 132 Ill. App. 3d 523, 527 (1985) (citing *People v. Lewis*, 88 Ill. 2d 129, 160 (1981)); see also *People v. Cox*, 22 Ill. 2d 534, 537 (1961). Only upon a showing of good cause will the court appoint alternative counsel. *Carter*, 132 Ill. App. 3d at 527. "Dissatisfaction with one's counsel, a deteriorated relationship, or the fact that defense  counsel and defendant argue or disagree about trial tactics, alone, will not constitute good cause for substitution." *People*

28

*v. Wanke*, 303 Ill. App. 3d 772, 782 (1999) (citing *People v. Royark*, 215 Ill. App. 3d 255, 266-67 (1991)).

¶ 69    At no point did Michael present any argument that the appointed counsel was incompetent or ineffective. Nor could he when the record established that Ms. McKnight's prior representation was effective and resulted in the dismissal of Michael's traffic charges. Nor can Michael argue that Ms. McKnight was ineffective in this case because Michael immediately withdrew his acceptance of the appointed counsel before Ms. McKnight could even represent him.

¶ 70    While Michael claimed he did not want Ms. McKnight as counsel because she was the reason everyone thought he had a mental illness and told him he would have an all-white jury in a different case, such claims merely show dissatisfaction and deteriorated relationship with counsel along with a disagreement over trial tactics from a different case, all of which are insufficient to show good cause for a substitution of counsel. *Wanke*, 303 Ill. App. 3d at 782. Absent good cause, we cannot find the court's denial of Michael's request for alternative counsel was an abuse of discretion.

¶ 71                                    Neglect

¶ 72    Finally, Michael argues that the circuit court erred in finding Mi'Kayla neglected following the adjudicatory hearing. In support, Michael argues that (1) Mi'Kayla was immediately transported to the hospital following the accident, (2) he and Danesha provided verbal consent to treat the child "in any appropriate manner" and declined to provide written consent due to religious reasons, (3) Mi'Kayla received appropriate medical attention at Lurie and was transferred to Loyola within a matter of hours, (4) no testimony was offered suggesting that Mi'Kayla's injuries were aggravated by any delay in treatment or that she suffered any increased distress because of

29

the disputes between the adults surrounding her, (5) Danesha never left the child's side, and (6) Michael's "only expressed concerns were for her rights and her welfare." We disagree.

¶ 73 The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) provides the two-step procedure utilized to determine whether a minor should be made a ward of the court. *In re Z.L.* 2021 IL 126931, ¶ 58. The first step, which occurs during the adjudicatory hearing, addresses only whether the child is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2020). " 'Neglect' is the failure to exercise the care that circumstances justly demand, and it encompasses both willful and unintentional disregard of parental duty." *In re Ivan H.*, 382 Ill. App. 3d 1093, 1100 (2008) (citing *In re Gabriel E.*, 372 Ill. App. 3d 817, 822 (2007)). Each case involving allegations of neglect is unique and must be decided on the basis of its specific circumstances. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The State must prove the allegations in the petition "are more probably true than not." *In re Z.L.*, 2021 IL 126931, ¶ 61.

¶ 74 On review, we consider whether the circuit court's finding of neglect was against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d at 464. "Only a single ground for neglect need be proven, and thus when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005) (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)).

¶ 75 We first note Michael's claim of error regarding a lack of testimony that Mi'Kayla's injuries were aggravated by the delay in treatment has no merit. In addition to Michael providing no authority to support his claim, his contention is contrary to DCFS regulations addressing reports of child abuse and neglect in which a "neglected child" is defined as one "who is subjected to an environment that is injurious insofar as: the child's environment creates *a likelihood of harm* as to

30

the child's health, physical well-being, or welfare; and *the likely harm* to the child is the result of a blatant disregard of parent or caretaker responsibilities." (Emphases added.) 89 Ill. Adm. Code 300.20 (eff. Jan. 17, 2018). " 'Blatant disregard' means an incident where the real, significant, and imminent *risk of harm* would be so obvious to a reasonable parent or caretaker that it is unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures to protect the child from harm." (Emphasis added.) *Id.* Accordingly, a finding of neglect may be based solely on a risk of harm; actual harm is not required, although both may be factors for consideration "when assessing the degree of neglect." *In re D.F.*, 201 Ill. 2d 476, 497 (2002). Here, the issues were whether Mi'Kayla was neglected by reason of being a minor in an environment injurious to her welfare because the environment exposed her to the effects of Michael's mental illness or erratic behavior. A plethora of evidence addressing Michael's behavior and mental condition, both at the hospital and in other settings, was presented by both the State and Michael. The evidence revealed that Michael's behavior was the result of a personality disorder that altered his perception of reality. Notably, this evidence was presented by Michael via his examination of Dr. Jeckel. However, it is not enough for the State to present evidence of mental illness; "the State must also show that the mental illness 'places the child in an injurious environment.' " *In re Faith B.*, 216 Ill. 2d at 14 (quoting *In re Faith B.*, 349 Ill. App. 3d 930, 933 (2004)).

¶ 76    Here, the record revealed that Michael's constant obstructions interfered with the medical professionals' treatment of the minor. Notably, Michael "made delivery of care difficult for [the] entire team." He initially refused to allow the medical staff to even examine the minor. He also complained about the number of people trying to assess the minor and forced them to leave the minor's room. Thereafter, a physician had to obtain Michael's permission before the medical team

31

could re-enter the minor's room to conduct the medical assessment. Michael also refused to consent to the medical professionals photographing the burns, the placement of an IV to provide fluids, and the transfer of the minor to a burn unit. Additionally, Dr. Jeckel specifically spoke to the issue when he testified that Michael's diagnosis would interfere with his ability to make sound decisions regarding Mi'Kayla's health care.

¶ 77 It is difficult to see how Michael's interference with emergency room medical professionals attempting to render treatment to a minor child would not place the minor child in an injurious environment. While we recognize Michael's refusal to provide written consent for religious reasons, Michael's infatuation with his HIPAA rights and direct interference with hospital personnel—to such extent that it was necessary to remove Michael from the medical facility to provide treatment to Mi'Kayla—cannot be ignored. Regardless, even without Michael's erratic behavior, the finding of neglect as to count I of the supplemental petition is supported by the unrebutted testimony from Dr. Jeckel, who diagnosed Michael's mental illness and explained how that illness placed Mi'Kayla in an injurious environment.

¶ 78 Based on the evidence submitted, we cannot find that an opposite conclusion is clearly evident. Therefore, we affirm the circuit court's finding of neglect.

¶ 79                                   III. CONCLUSION

¶ 80 For the reasons stated herein, we affirm the circuit court's order finding that the Indian Child Welfare Act was not applicable, the court's refusal to appoint "alternative counsel" was not an abuse of discretion, and the circuit court's finding of neglect was not against the manifest weight of the evidence.

¶ 81 Affirmed.

32